## HARLEQUIN ENTERPRISES LIMITED, Plaintiff,

v.

## GULF & WESTERN CORPORATION, Defendant.

### No. 80 Civ. 1639.

United States District Court,
S. D. New York.

Sept. 5, 1980.

As Amended Sept. 15, 1980.

---

tion law. Harlequin is apparently the leading publisher of paperback romance fiction novels, whose six new titles a month are sold through unconventional retail outlets, e. g., drug stores, supermarkets, to untold millions of regular and devoted readers, as well as through Harlequin Book Club memberships to countless others. Although plaintiff sells several different series of romance fiction titles, the instant dispute only concerns the cover design of books retailed under the rubric of the "Harlequin Presents" series. Simon & Schuster, the alleged infringer, is no stranger to the romance fiction series market. From 1966 to 1972 Simon & Schuster served Harlequin as its publisher and exclusive distributor in the United States. Thereafter, Harlequin took over the publishing responsibilities while Simon & Schuster continued to act as the exclusive United States distributor. Finally, in 1979, Harlequin notified Simon & Schuster that its distributorship agreement would be terminated at the end of the year. Simon & Schuster subsequently decided to launch its own "Silhouette Romance" series to compete with plaintiff's product.

■ The principal ground alleged in support of the preliminary injunction is that the size, color arrangement and format (hereinafter collectively "design" or "format") of the cover of defendant's "Silhouette Romance" series infringes upon the trade dress of plaintiff's "Harlequin Presents" series. After considering the voluminous materials submitted by the parties and having heard extensive oral argument, I conclude that plaintiff has met its burden of demonstrating (a) irreparable harm and (b) both (1) likelihood of success on the merits and (2) a sufficiently serious question going to the merits as to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jack Kahn Music v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979). *See also Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973).

Patterson, Belknap, Webb & Tyler, Christine H. Miller, Thomas C. Morrison, W. B. McKeown, New York City, for plaintiff.

Proskauer Rose Goetz & Mendelsohn, by Ronald S. Rauchberg, David M. Rabinowitz, New York City, for defendant.

### MEMORANDUM AND ORDER

OWEN, District Judge.

Plaintiff Harlequin Enterprises Limited ("Harlequin") moves for a preliminary injunction enjoining Simon & Schuster, a division of defendant Gulf & Western Corporation, from an alleged infringement of a Harlequin book cover design and format in violation of the Lanham Act, 15 U.S.C. § 1125(a) and the New York unfair competi-

■ The Lanham Act creates a federal statutory remedy to unfair competitive practices. It provides protection against the sale of goods by use of

> a false designation of origin or any false description or representation, including words or other symbols tending falsely to describe or represent the same
>
> . . . .

15 U.S.C. § 1125(a). Courts have long recognized that recovery under § 43(a) is not restricted to federally registered trademarks, but extends to "words, symbols, collections of colors and designs, or advertising materials or techniques" that the purchasing public has come to associate with a single source. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1059 (2d Cir. 1979). *See also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950 (2d Cir. 1980); J. T. McCarthy, Trademarks and Unfair Competition § 15.3 (1973). Thus, in order to prevail under § 43(a), plaintiff must demonstrate (1) that its marks have a "secondary meaning" in the marketplace; (2) that the allegedly infringing design or mark is substantially similar to plaintiff's own marks; and (3) that there is a "likelihood of confusion" as to the origin of goods bearing the disputed design or mark. *Perfect Fit Industries, Inc. v. Acme Quilting Co., supra; RJR Foods, Inc. v. White Rock Corp., supra; Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631 (2d Cir. 1979).

1. *Secondary Meaning*

First, the parties do not dispute the fact that the name "Harlequin Presents" has acquired a "secondary meaning," i. e., that the vast romance novel purchasing public has come to associate its name and colophon [1] with a single source. For those with such association, a "Harlequin Presents" novel will always have a common theme, e.

g., the story will have a happy ending with a proposal of marriage, notwithstanding various misunderstandings and obstacles along the way. Equally, the cognoscenti know that there will be no vulgar language, loose living, or any descriptions of explicit sex.

The question is whether the format of the "Harlequin Presents" series cover itself has acquired such a secondary meaning among readers of romance fiction. The format on each volume in the Harlequin series is identical. Each has a glossy white cover of six and three–quarter inches. The Harlequin trademark, a black and white sketch of a Harlequin located in a gold diamond, is centered at the top of the cover. The diamond is flanked by a gold filigree extending from both sides of the mark. The series number appears in the top left corner, and the price of the book is located in the top right corner.

Immediately under the gold filigree and centered near the bottom of the Harlequin mark is the series title, "Harlequin Presents", written in black script. The author's name is printed in large colored letters located just under the series title. A fine gold line separates the author's name from the book's title, which is printed in lower case block letters. Just below the book title on each cover is a circular, colored montage featuring a man and a woman against a background of scenes depicting the story line; this picture is encircled by two gold lines. The gold filigree is repeated at the bottom of the page. All three hundred and seventy–two covers of the books in the "Harlequin Presents" series use this exact format.

Turning to the allegedly infringing "Silhouette Romance" series, each book has a glossy white cover and is six and three–quarters inches in height.[2] The Silhouette

---

1. "Colophon" is a word used in the publishing industry to denote a mark or logo that identifies a particular publisher.

2. It is interesting to note that the "Silhouette Romance" books are the only paperback books published by Simon & Schuster that are slightly smaller than a standard paperback, being only six and three–quarters inches high. Simon & Schuster's "Pocketbook" series books are six and seven–eighths inches in height. While the identity in height between the "Harlequin Presents" and "Silhouette Romance" books is susceptible to an innocent explanation, i. e., economy, it is at least as likely that Simon & Schuster chose the smaller size to

colophon, the black silhouettes of a man and a woman facing each other in profile and framed in a tiny, pale gold oval, is centered near the top of the cover. The title of the series, "Silhouette Romance," appears in black script adjacent to the colophon, one word on either side of it. A pale gold filigree, emanating from a point directly above the center of the colophon, extends across the top of the cover. In the top left corner, immediately below the left end of the filigree and to the left of the word "Silhouette," is the series number of the book. At the corresponding point in the upper right corner is the price, to the right of the word "Romance." The author's name is printed in large, colored letters and centered below the series title and the "Silhouette" colophon. The book title is printed in smaller black letters, immediately below the name of the author. Most of the bottom half of the cover is devoted to an oval–shaped, color drawing of a man and a woman who appear in a scene suggestive of the book's story line. The picture has no frame around it–rather a soft edge that blends into the white background of the cover. Finally, the words, "Silhouette Romance," written five times in pale gold script, form a border around three sides of the cover. The words are printed vertically twice on each side of the page and horizontally once at the bottom. All of the covers in the "Silhouette Romance" series use this format.

■■■ The "secondary meaning" requirement is designed to insure that trademark protection is extended only to those designs, symbols and/or combinations of colors that

act as identification for a product, i. e., a way for the purchasing public to recognize the quality and reputation associated with a particular publisher's books. Whether a given mark has acquired "secondary meaning" may be determined by such factors as (1) plaintiff's advertising and sales record; (2) consumer recognition survey data; (3) recognition by competitors of consumer identification with product design; (4) defendant's attempt to capitalize on plaintiff's trade dress when introducing its own product; and (5) conscious imitation of plaintiff's trade dress. *RJR Foods, Inc. v. White Rock Corp., supra.* Such factors are merely a gauge of the extent to which plaintiff's mark has become widely accepted by its customers and its competitors. For the reasons stated hereafter, I conclude that Harlequin's cover design has acquired a secondary meaning among romance fiction readers.

Persuasive evidence of the "secondary meaning" of the Harlequin cover can be found in a study conducted on behalf of the plaintiff by Spencer Bruno Research Associates. Mr. Bruno interviewed five hundred women, all readers of romance fiction in three cities. The interviewees were shown "dummy" copies of as yet unpublished "Harlequin Presents" titles with the Harlequin name and colophon masked. Research results indicate that over fifty percent of the interviewees correctly identified Harlequin as the publisher of the books. *See* Affidavit of A. Spencer Bruno at 2, Exhibit 2. While the results of any survey research are open to–even invite–challenge by way of competing experts[3] and rival studies,[4]

cause readers to confuse the two series. This alternative explanation is supported by the fact that defendant ordered the sales persons to place "Silhouette Romance" books in "Harlequin" bookracks, or so–called "booktiques" which were designed to accommodate only the smaller "Harlequin Presents" series.

3. Defendant's expert submits an affidavit attacking the methodology employed in the Bruno survey. *See* Affidavit of Baumgarten. Affiant argues that the Bruno study is unreliable because of Harlequin's dominance of the romance fiction market. While Professor Baumgarten may be correct that Harlequin's market

dominance had some impact on the Bruno survey's outcome, the court is not persuaded that the results should be totally disregarded. *See* Reply Affidavit of A. Spencer Bruno.

4. In fact, defendant commissioned its own expert to replicate the Bruno study using a masked copy of a Candlelight Romance instead of a Harlequin Presents. *See* Affidavit of Seymour Lieberman. Thirty percent of the respondents to the Lieberman study indicated that the publisher of the exhibited book was Harlequin. Defendant concludes that these results support its view that Harlequin's market dominance distorts the Bruno survey results.

courts have found such studies to be useful tools in assessing "secondary meaning." *See RJR Foods, Inc. v. White Rock Corp.,* supra; *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 686–87 (S.D. N.Y.1963). Although the Bruno survey is not conclusive evidence of secondary meaning, the results strongly support the plaintiff's claim that its cover format has acquired a "secondary meaning."

In addition, the following factors strongly favor a finding that the plaintiff's cover design has acquired a secondary meaning. First, Harlequin has enjoyed a phenomenal sales success. In 1979, it sold more than twenty million "Harlequin Presents" books in the United States alone. Second Harlequin has engaged in extensive national advertising directed at both retail customers and the book trade. In addition, unsolicited national and local press and t. v. publicity has focused on the Harlequin reader and the seemingly endless demand for Harlequin romance books. Moreover, evidence of the widespread acceptance of the "Harlequin Presents" series did not go unnoticed by Simon & Schuster executives who closely studied the editorial and marketing practices of Harlequin and consciously imitated the same. None of these factors alone provides conclusive proof of the existence of "secondary meaning." However, plaintiff has presented substantial evidence which, when taken together, leads to a preliminary finding that the "Harlequin Presents" cover design and format has acquired a "secondary meaning" among readers of romance fiction.

### 2. Likelihood of Confusion

Turning to the second element of a trademark infringement case, the "likelihood of confusion" between the allegedly infringed and infringing properties, plaintiff is entitled to preliminary injunctive relief upon a showing that consumers are likely to confuse the defendant's product with its own.

Whether such a showing has been made in this procedural context is a question of fact for the court to resolve. The question is not, it must be noted, whether defendant's trade dress is identical to that of plaintiff, rather "[i]t is the combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public." *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.,* 618 F.2d 950 (2d Cir. 1980) *quoting Pharmaceuticals, Inc. v. United Whelan Corp.,* 22 Misc.2d 532, 534–35, 197 N.Y.S.2d 22 (Sup.Ct.1959). As the Court of Appeals had also stated a year earlier, "[t]he test of consumer confusion is not whether the products can be differentiated when subjected to side–by–side comparison, but rather whether they create the same general overall impression." *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir. 1979). On the record before me, I conclude without hesitation that defendant's trade dress is so substantially similar to that of plaintiff as to be likely to create the same general overall impression in the mind of the public. Reference to the facts of the case readily substantiate this view.

An inspection of the books here in issue reveals that each bears a glossy white cover, the top half of which bears a trademark and some printed information and the bottom half of which is devoted to a color illustration. Each book is six and three–quarters inches high. Starting at the top, each book bears a price and a series number, the price being in the upper right–hand corner in black ink and the series number being in the upper left–hand corner in black ink. Next, each has scroll work in essentially gold colors. Next, each has its publisher's small colophon, Harlequin's framed in a gold diamond, and Silhouette's in a paler gold colored oval. Each colophon has one word printed on each side of the colo-

The Lieberman results are, however, susceptible to a different interpretation. An examination of the Candlelight cover shown to the respondents reveals a cover that itself has features strikingly similar to a Harlequin cover.

That fact alone raises serious questions as to the probative value of the Lieberman results. *See also* Reply Affidavit of A. Spencer Bruno at 4–5.

phon: "Harlequin (colophon) Presents" on plaintiff's volumes, and "Silhouette (colophon) Romances" on defendant's volumes. Both use a similar, small scroll type for the series title and both are printed in black ink. Continuing down the cover, next is the author's name. On both volumes it is printed in large, colored capital letters and is in larger type than any of the other words on the cover. Next, the title of the book appears immediately below the author's name on both covers and appears in black print on both. Below the title, and consuming almost the bottom half of each of the covers of each of the books in both series, is a colored drawing of a man and a woman set in some scenery which suggests the story line of the book. The picture is circular on plaintiff's volumes and has a border, while the picture is slightly oval on defendant's volume without a border. Although, obviously, the various representations are not identical, one's general overall impression of the drawings is that they are of a substantially similar artistic level. Finally, each volume, when viewed from some distance, appears to have gold scroll work at the bottom of the cover. Upon closer view, defendant's scroll work actually reads, "Silhouette Romances," whereas plaintiff's scroll work is a purely decorative arrangement, but the impact upon the eye is almost identical.

■ Moreover, the substantial similarity between the "Silhouette Romance" and "Harlequin Presents" covers noted above did not result from accident or inadvertence. A Simon & Schuster executive appears to have selected the cover design now in use from some twenty cover designs proffered by the Art Director, many of which would have unquestionably been non–infringing. Indeed, the one selected appears to have been that which most closely resembles the "Harlequin Presents" cover. Also, a Simon & Schuster memorandum reveals that it was decided at the outset that the "Silhouette Romance" series would copy the editorial approach of the "Harlequin Presents" series in such a way that "the true Harlequin reader [could] not tell the difference." While "the second comer

has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer," *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960), see *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, supra, defendant was deliberately doing the opposite.

Next, ample evidence has been adduced by plaintiff to demonstrate that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *McGregor Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979). In fact, there is some evidence of actual confusion by Harlequin consumers who mistakenly believe that the "Silhouette Romance" series is simply another romance fiction series sponsored by the publishers of Harlequin books. Such confusion as to the sponsorship of the "Silhouette Romance" series "satisfies the confusion requirement," *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979).

Finally, the similarities in appearance of the "Harlequin Presents" and "Silhouette Romance" covers has resulted in actual confusion among the trade. In the short time that the "Silhouette Romance" series has been on the market, Harlequin has received over 6500 misdirected Silhouette book returns from retailers. While some small amount of this happens under even normal circumstances, such compelling evidence of actual confusion of those in the book selling trade leaves little doubt as to the likelihood of confusion among readers of romance fiction.

It is contended that plaintiff knew of defendant's plan and cover format as early as January 1980, and yet waited until early July–three months after the initial shipment of books–to apply for injunctive relief. Plaintiff asserts various reasons for this delay, and vigorously maintains that it has not inexcusably delayed prosecution of this motion. However, on the papers alone, I am unable to make an appropriate deter-

mination of these factual issues. Nonetheless, given my conclusion that defendant's cover is an infringement of plaintiff's cover format, I deem it appropriate to grant plaintiff prospective injunctive relief while deferring to another time a hearing on this unresolved issue.[5] *See Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); *McLean v. Fleming,* 96 U.S. 245, 24 L.Ed. 828 (1877); *Aunt Jemima Mills Co. v. Rigney Co.,* 247 F. 407 (2d Cir.), *cert. denied,* 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1917); *Mandee Fabrics, Inc. v. Slifka,* 97 F.Supp. 187 (S.D.N.Y.1951). *See generally,* 11 C. Wright & A. Miller, Federal Practice & Procedure § 2946 (1973).

Given the foregoing, plaintiff's motion for preliminary injunction is granted to the following extent: that "Silhouette Romance" pages shall not hereafter in the normal course of manufacture have affixed to them in preparation for shipment to retailers or otherwise, any cover using the present format which the court preliminarily finds to be an infringement. The foregoing does not prohibit defendant from shipping in the regular course of business any volumes to which covers in the present format have already been affixed.

The foregoing is so ordered.

---

5. To the extent that plaintiff's entitlement to an accounting of profits is contingent upon a determination of the laches question, this issue can also be resolved at a future date.