**A.J. CANFIELD COMPANY, Plaintiff,**

v.

**VESS BEVERAGES, INC., Defendant.**

**No. 85 C 4368.**

United States District Court,
N.D. Illinois, E.D.

July 8, 1985.

Richard H. Compere, Pamela J. Johnson, Jeffery A. Handelman, Willian, Brinks, Olds, Hofer, Gilson & Lione Ltd., Chicago, Ill., for plaintiff.

Beverly W. Pattishall, David C. Hilliard, John Bostjancich, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

A.J. Canfield Company ("Canfield") has sued Vess Beverages, Inc. ("Vess"), claim-ing "federal unfair competition" (invoking for that purpose Lanham Act ("Act") § 43(a), 15 U.S.C. § 1125(a)) and also as-serting several related pendent state law claims. This Court has conducted a June 7, 1985 evidentiary hearing (the "Hearing") on Canfield's motion for preliminary injunc-tive relief. At the Hearing this Court heard the testimony of Canfield's Senior Vice President Alan Canfield, Vess's Presi-dent Don Schneeberger ("Schneeberger") and the market researcher who conducted a brief survey for Vess (see Appendix), and it has considered the numerous exhibits and affidavits tendered by both litigants both at and after the Hearing (most recent-ly a July 1 affidavit by Schneeberger, with accompanying Vess exhibits). Vess has also moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. Finally each par-ty has submitted extensive legal memoran-da addressing both motions, as well as its proposals for this Court's findings of fact and conclusions of law.

In accordance with Rule 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any the Findings as stated reflect legal conclu-sions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### Findings of Fact

1. Canfield is a corporation both incor-porated in Illinois and having its principal place of business in Chicago, Illinois. For diversity jurisdictional purposes it is an Illi-nois citizen.

2. Vess is a corporation both incorporat-ed in Missouri and having its principal place of business in St. Louis, Missouri. For diversity jurisdictional purposes it is a Missouri citizen.

3. Since 1924 Canfield has been, and it continues to be, actively engaged in the business of bottling and selling soft drinks primarily in the midwest. It has registered

its "Canfield's" trademark in the United States Patent and Trademark Office as Reg. Nos. 976,004 and 927,808 (DX 25–27).[1] It currently markets a number of soft drinks under the well-known Canfield's trademark (DX 18).

4. About 1971 Canfield set out to try to develop a diet carbonated soft drink[2] that would be low in calories but nevertheless have a taste similar to chocolate. By 1972 it had developed such a soft drink, which it proceeded to market under the designation "Chocolate Fudge" and to describe as an "artificially sweetened chocolate soda." Its soft drink was sugar-free and did not contain any cocoa. All the flavor and color contained in the soft drink were artificial (PX 22).

5. In 1972 Canfield kicked off its new product with substantial advertising in radio and television, and with product couponing. Its Chocolate Fudge had moderate market success. Before January 1985 Canfield sold on the average 1.25 million cans of its Chocolate Fudge annually (those sales, like those of Canfield's other soft drinks, were primarily in the midwest).

6. Canfield's original container for its Chocolate Fudge (PX 22) was used until 1980, when the graphics were slightly modified (PX 38). In 1984 Canfield began use of its current container (PX 23).

7. In 1984 Canfield switched all its diet soft drinks to contain 100% NutraSweet.[3] Assisted by a cooperative advertising arrangement with Searle, Canfield spent $500,000 in advertising those products. Canfield retained a public relations firm to assist it in that activity, and it had several articles written about Canfield and its products, including its Chocolate Fudge.

8. No company other than Canfield had used the designation "Chocolate Fudge" in association with a carbonated soft drink until after January 1985, although numerous other companies, including Vess, have sold carbonated diet chocolate drinks. Industry publications have consistently referred to that group of drinks as "chocolate-flavored soft drinks" or "chocolate drink" (PX 4, 39). Until January 1985 Canfield was unique in its use of Chocolate Fudge in a trademark manner for a carbonated soft drink with a chocolate flavor.

9. On January 13, 1985 the Chicago *Tribune* and some 80 other newspapers contained a nationally syndicated column (PX 1) written by Bob Greene ("Greene") about Canfield's Chocolate Fudge. Greene's article said he had vaguely remembered reading a story in the *Tribune* about Canfield's, and he characterized his "discovery" of Canfield's Chocolate Fudge as "a miracle." Greene (a self-confessed chocoholic) compared Canfield's Chocolate Fudge to a hot fudge sundae, and he told how it helped him maintain his diet by satisfying his desire for chocolate. As an immediate result of Greene's article a tremendous demand was created for Canfield's Chocolate Fudge. Initially Canfield was unable to satisfy that demand, especially in areas outside the midwest where its Chocolate Fudge had never been sold.

10. Following Greene's article the enormous skyrocketing demand for Canfield's Chocolate Fudge generated substantial print coverage in newspapers and magazines across the country (PX 2–17), including the *New York Times* and *Time* magazine, and numerous television and radio news stories. In turn that widespread media coverage increased the escalating demand, which in turn generated further media coverage. Canfield estimates it has had over two hours of prime time coverage

---

1. "PX—" denotes Canfield's Exhibits, and "DX—" denotes Vess's Exhibits, introduced and admitted at the Hearing.

2. To avoid repetition, these Findings and Conclusions will usually omit the words "diet" and "carbonated," which should be understood as included in each reference to Canfield's and Vess's soft drinks. In like manner, Canfield's Chocolate Fudge carbonated diet soft drink will be referred to simply as "Canfield's Chocolate Fudge" throughout. Of course, as the remaining Findings and Conclusions make plain, that usage does not derogate from the determination that "Chocolate Fudge" itself—without the prefatory "Canfield's"—is used as a trademark by Canfield.

3. NutraSweet is a trademark of G.D. Searle, Inc. ("Searle") for its artificial sweetener aspartame.

from television broadcasts throughout the United States since Greene's article appeared (PX 24).

11. At the Hearing Canfield sought to ascribe the truly astonishing growth in demand for (and sales of) its Chocolate Fudge in substantial part to its public relations efforts, which had in fact antedated Greene's article and which then seized the opportunity presented by Greene's article to maximize the favorable image presented by that article. Though Canfield and its public relations firm have in fact exercised substantial efforts in that respect (since January 13, 1985 Canfield has spent a considerable amount of money in advertising and promoting its Chocolate Fudge, and it estimates that it and its licensees will spend up to $6 million in the next year in advertising and promoting the product), no such activities could account for the unprecedented success story here: In the four months after appearance of the Greene article, sales of Canfield's Chocolate Fudge aggregated 50 million cans (100-fold times the prior volume described in Finding 5, as previously increased by the advertising efforts described in Finding 7). Instead that success story is a dramatic confirmation of the power of the press, assisted of course by Canfield's own activities.

12. Increased and still-increasing demand for Canfield's Chocolate Fudge, as referred to in Findings 9–11, is undoubtedly the result of the synergistic phenomena described in Finding 10. But what is relevant for current purposes is not the *cause* but the *effect* of those phenomena: Spectacular public acceptance of and demand for Canfield's Chocolate Fudge. And given the uniqueness of Canfield's use of Chocolate Fudge as a designation for a carbonated soft drink for years before and up to the time of Greene's article, that acceptance and demand substantially increase the likelihood the Chocolate Fudge designation has acquired a secondary meaning as a trademark designating Canfield's product.

13. Added manifestations of the trademark character of Chocolate Fudge, as used by Canfield, are found in collateral effects inuring to Canfield's benefit following the appearance of Greene's article. Canfield has developed numerous promotional items, such as bags, beach towels, bumper stickers and buttons promoting its Chocolate Fudge trademark (PX 25).

14. By reason of the developments described in the preceding Findings, Canfield has received requests from most of the major bottlers throughout the United States to obtain licenses to manufacture and sell Canfield's Chocolate Fudge. Canfield's has now licensed 12 major bottlers in the United States to produce and sell its Chocolate Fudge. With those licensees, Canfield's product will now be available throughout the entire United States. Canfield has also received numerous phone calls and letters from consumers requesting Canfield's Chocolate Fudge or asking where they can obtain it (PX 30).

15. Vess contends "the phrase 'chocolate fudge' names a well known flavor" (Vess Proposed Finding 43). For that proposition it quotes from Webster's New International Dictionary, Second Edition (DX 16):

choc'o-late, *n.*

1. The solid or pliable mass obtained by grinding roasted cacao beans which have been freed from germ and shell;—sometimes called *plain* or *bitter chocolate* to distinguish it from *sweet chocolate* which contains added sugar, and *milk chocolate* which contains added sugar and dried milk. Cf. CACAO, COCOA.

2. The beverage made by cooking a portion of the above in water or milk.

3. A small candy with a center as of fondant, nougat, or nut, and a coating of chocolate;—disting. from *bonbon.*

4. The color of chocolate; a brown, red-yellow in hue, of low saturation and low brilliance. Cf. COLOR.

5. *Bot.* The purple avens (*Geum rivale* ).

COMBINATIONS and PHRASES are:
chocolate candy
chocolate-coated
chocolate-colored

chocolate-covered
chocolate dipper
chocolate drop
chocolate fudge
chocolate grinder
chocolate grinding
chocolate maker
chocolate mill
chocolate mixer
chocolate mold
chocolate molder
chocolate molding
chocolate packer
chocolate paste
chocolate-red, *adj.*
chocolate sauce
chocolate sifter
chocolate wrapper

That argument proves too much. Not one of the other listed "combinations and phrases" represents a *flavor*. Instead the dictionary listings, taken both separately and together, strongly suggest the opposite conclusion: None of the combinations and phrases (including "chocolate fudge") is itself a flavor, but rather "chocolate" is the flavor, while the other words carry other meanings or connotations. And that common-sense reading is wholly consistent with Canfield's contention Chocolate Fudge is a "merely descriptive" or "suggestive" trademark as applied to its product.

16. Finding 15 is buttressed by a definition Vess has studiously avoided—that of "fudge" itself. Webster's Third New International Dictionary defines that word this way:

> a soft candy made typically of sugar, milk, butter, and chocolate cooked together and beaten to a creamy consistency.

"Fudge" thus carries to the normal reader a mental image of its texture or consistency as a food product—creaminess, smoothness and thickness.

17. "Chocolate fudge" is a term used to designate a substantial number of products that combine the *flavor* of chocolate with the *consistency* or *texture* of the kind referred to in Finding 16: chocolate fudge toppings, puddings, frostings, cakes, brownies, cookies, ice cream or even one creamy and smooth (non-carbonated) diet drink (DX 6–15). As to many if not all such products the words "chocolate fudge" would have substantially greater difficulty in being established as a valid trademark, for the term's usage as to such products is far more common (making the acquisition of secondary meaning highly unlikely) and is more nearly generic in nature. But it is not at all unusual for a term to be incapable of trademark protectibility in one usage (because "commonly descriptive"—that is, generic), while nonetheless entitled to protection as a trademark in a different usage (because either "merely descriptive" or "suggestive"); see Conclusion 8(a).

18. Fudge comes in a range of flavors (vanilla and others), though chocolate is most common. Chocolate fudge often has a somewhat different flavor from other chocolate flavors, such as milk chocolate, sweet chocolate, bitter chocolate or "white" chocolate. But chocolate fudge is not really a single distinctive flavor. At the invitation of Vess's counsel during the Hearing, this Court made a brief taste-and-smell sampling of both milk chocolate and chocolate fudge candy (purchased by counsel from a local high-quality candy store) in comparison with Vess's "chocolate fudge" product, and this Court has on a number of occasions (both before and after the Greene article) tasted Canfield's Chocolate Fudge. To this Court neither of the two diet soft drinks (Canfield's or Vess's) has a flavor or smell closely approximating that of commercially-sold or home-made chocolate fudge candy. Rather both soft drinks clearly convey the impression of a *chocolate* taste. As to each, an accurate (and wholly adequate) description of its flavor alone would be "chocolate," not "chocolate fudge." This too supports the determination Chocolate Fudge is "merely descriptive" or "suggestive," rather than generic, as to both Canfield's and Vess's products.

19. By contrast with true chocolate fudge, Canfield's Chocolate Fudge has the consistency of water and contains no sug-

ar, milk, chocolate or butter. That is true of Vess's diet chocolate soft drink—now sold under the "Chocolate Fudge" designation—as well. It is also true of each of the other products referred to in Finding 28 as having hopped on Canfield's Chocolate Fudge bandwagon by newly designating their own diet carbonated chocolate soft drinks as "chocolate fudge." This also supports the determination Chocolate Fudge is "merely descriptive" or "suggestive," rather than generic, as to all such products.

20. Schneeberger is Vess's principal owner and operator. Vess has about 12% of the soft drink market in the St. Louis area, but it considers its area of greatest future growth to be outside the St. Louis area. Its products are sold throughout the midwest and in some southern and eastern states. At one time Schneeberger owned another company, Custom Packaging Corp. ("Custom"), which engaged in the bottling of soft drinks in the St. Louis area. During the period 1973 to 1978 Custom was a licensee of Canfield and produced and sold, among other products, Canfield's Chocolate Fudge.

21. For several years Vess produced and sold a carbonated diet chocolate drink of its own, its can accurately indicating the product's taste as "chocolate"—not "chocolate fudge." Vess stopped producing the product in approximately 1981 because of lack of demand (PX 27, 28).

22. Vess's label for its chocolate drink carried the universal product code number 72827 00219. That magnetic code is used by retailers to facilitate the checkout of products by recording and stating the price and name of the item. It is also used by retailers in controlling inventory.

23. After Vess became aware of the public demand for Canfield's Chocolate Fudge product following Bob Greene's article, Vess decided again to produce a carbonated diet chocolate drink, but this time to use the designation "Chocolate Fudge" rather than "chocolate" alone. During the week of May 6, 1985 an article in the St. Louis *Business Journal* stated Vess was "reintroducing" that week its chocolate flavored soft drink under the designation Chocolate Fudge in an attempt to capitalize on the sudden demand. Indeed the article attributed to Schneeberger the statement (at odds with Schneeberger's Hearing testimony and the facts) "Vess stopped producing its *chocolate fudge* soda about two years ago because demand was so poor" (PX 21, emphasis added).

24. Vess's container for its new product prominently displays the words "Chocolate Fudge" in two locations, one of which is followed by the descriptive phrase "artificially flavored soda." Vess's can also bears its VESS trademark (PX 35).

25. Vess's container bearing the designation "Chocolate Fudge" carries the same universal product code number (72827 00219) as its prior chocolate drink (see Findings 21 and 22). In his Hearing testimony Schneeberger offered a disingenuous explanation of the reason for that choice (saying he was concerned about "running out of numbers"!). But given the huge number of available code numbers (Vess uses the 00200 series for its carbonated diet soft drink line and has fewer than 20 flavors in that line, thus leaving more than 80 numbers still available in that series, even without going to any of the hundreds of still-available other series of 100 numbers each), Vess's conduct reflects it is rather seeking to sell old wine in new bottles: It is beginning to market essentially the same chocolate drink as before (albeit, it asserts, with some flavor modification), but this time it is seeking to ride on Canfield's coattails by taking advantage of Canfield's Chocolate Fudge trademark and its widespread and still escalating public acceptance.

26. In its current marketing efforts, Vess has prominently used "Chocolate Fudge" in an advertisement to the grocery trade. That ad's most prominent words state "Diet Chocolate Fudge Now Available From Vess" (PX 36). That ad's purport and clear intention are to convey to members of the public that the same product of Canfield's for which the enormous

public demand has been established, and as to which there is substantial reason to believe the public identifies the product as Canfield's Chocolate Fudge, is now available from Vess.

27. That false impression is bolstered by the fact that from time to time Canfield and others have licensed trademarks for use by regional bottlers with the regional bottlers' own housemarks. Canfield itself is a licensee of the federally registered trademark "50/50," which it uses with its own "Canfield's" housemark. Canfield also licenses other bottlers to use its federally registered "Swiss Creme" trademark in association with the other bottlers' housemarks.

28. Even apart from the practice referred to in Finding 27, to permit Vess to continue its use of "Chocolate Fudge" to designate its product would tend to destroy the value of Chocolate Fudge as a designation of source indicating Canfield's product. That threat is enhanced by the fact that two other companies have now entered the field with newly-marketed (post-Greene-article) carbonated diet soft drinks employing "Chocolate Fudge" designations (DX 6, 36). Without injunctive relief against such infringements, Canfield will suffer the loss of the continuing synergistic effect referred to in Finding 10. There will be substantial diminution in the value of Canfield's mark that cannot adequately be compensated in money damages, in part because of the difficulties in calculation of such damages and in part because such infringements create an adverse impact beyond any sales that may be diverted to the infringers (among other reasons, for the reason stated in Finding 29).

29. Canfield has no control over the ingredients and quality of Vess's chocolate drink. Canfield has a concern as to the consistency of quality of Vess products (PX 29). It has already received a communication from one consumer that disliked the taste of Vess's product (PX 30C). Whether or not Vess in fact imposes adequate quality control over its products, there is no legitimate reason for Canfield to be placed

at risk in that respect. As to products the public associates with Canfield, it is entitled to direct control over its quality and taste. Lack of control over an infringer's product dilutes and is inherently damaging to the value of a trademark owner's mark.

30. Canfield became aware Vess was contemplating introducing a carbonated soft drink using the designation "Chocolate Fudge" about April 1, 1985 (Canfield Aff. 16). On April 4 Canfield sent a cease-and-desist letter to Schneeberger, a reply to which was sent by Vess's attorneys April 16 (PX 19, 20). Canfield filed this action May 2, and the Complaint was personally served on Vess May 6.

31. At the time Vess received Canfield's cease-and-desist letter, it had made minimal financial commitments (in purchases of cans, advertising or otherwise) involving the designation "Chocolate Fudge." Vess's decision to proceed on its course of action in the face of Canfield's notification must be considered to have been at its own peril.

32. Schneeberger stated in his affidavit Vess had undergone considerable expense in communicating with brokers and retailers to obtain shelf space for its chocolate drink and to obtain retail acceptance for its product. However, Schneeberger did not deny the statement attributed to Mike Duffy, Vess's Director of Sales and Marketing, in the May 27, 1985 issue of *Advertising Age* (PX 31):

> [R]etailers are calling up and asking us to get it to them as soon as possible. We usually have to work hard to get anything new on the shelf. This is quite a change of pace.

33. Vess offered into evidence a survey in which interviewees were shown one of Canfield's Chocolate Fudge cans and then asked the question "What do the words Chocolate Fudge on this can indicate to you?" That survey was conducted in several locations in downtown Chicago in less than a 12 hour period. For the reasons stated in the Appendix, Vess's survey has no real probative force in reflecting the presence or absence of secondary meaning

in Canfield's Chocolate Fudge trademark. Indeed, as the Appendix reflects, a substantial number of the responses support Canfield's position that the mark is suggestive or, at a minimum, "merely descriptive" rather than generic.

### Conclusions of Law

■ 1. This Court has jurisdiction over the parties and the subject matter under 15 U.S.C. § 1125(a) and 28 U.S.C. § 1331. It makes no difference to suit under Section 1125(a) (Act § 43(a)) that Canfield's trademark is not federally registered. *United States Jaycees v. Chicago Junior Ass'n of Commerce and Industry,* 505 F.Supp. 998, 1001 (N.D.Ill.1981). In conjunction with that federal question jurisdiction, this Court has pendent jurisdiction over Canfield's state-law claims.

2. Before the decision in *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984) our Court of Appeals' most common articulation of standards for preliminary injunctive relief required the plaintiff to bear the burden of proof on each of four factors (see, e.g., in the trademark arena, *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 864 (7th Cir.1983), which stated the factors this way):

(1) whether the plaintiff will have an adequate remedy at law or [4] will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and,

(4) whether the granting of a preliminary injunction will disserve the public interest.

Several post-*Roland* cases have reverted to the same four-factor formulation; see, e.g., *Palmer v. City of Chicago,* 755 F.2d 560, 576 (7th Cir.1985) (using the disjunctive in the first factor and citing *Roland* as authority for the "well-settled" four-factor test!). These Conclusions will deal with the required showing in both *Roland* and four-factor terms.

3. Among the principal refinements and clarifications *Roland* has added to the previously (and perhaps subsequently) conventional statement of standards are:

(a) Plaintiff must show both the lack of an adequate remedy at law *and* irreparability of harm. *Roland,* 749 F.2d at 386. Some earlier cases, and even some later ones (see, e.g., *Palmer*), could be read as requiring only one of those two showings.

(b) Plaintiff's required showing of probability of success on the merits varies with the quality and quantum of harm plaintiff will suffer from the denial of the injunction. That calls for a "sliding scale" evaluation of the likelihood of success and the relative harm to the parties: To the extent plaintiff's showing on one of those factors is stronger, a lesser degree of showing is required on the other. *Roland,* 749 F.2d at 387.

■ 4. Canfield's lack of an adequate remedy at law (as defined by Fiss & Rendleman, *Injunctions* 59 (2d ed. 1984), cited by *Roland,* 749 F.2d at 386) is self-demonstrative. Trademark ownership—the public's continued identification of the product bearing the mark with the owner of the mark—is a meaningless right unless the infringer can be enjoined. Damages cannot supplant the trademark owner's right to its exclusive use. That is really what the trademark cases mean when they say (*Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir. 1982)):

*Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976))—usually without explaining why "or" or "and" was the appropriate locution (*Fox Valley, id.* at 1097 n. 1 was an exception).

---

**4.** [Footnote by this Court] One of the matters discussed in *Roland,* 749 F.2d at 382–383 was the disconcerting habit of our Court of Appeals of stating this factor in the disjunctive in some cases but in the conjunctive in others (see, e.g.,

This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law.

5. Canfield's irreparable harm is also beyond question. It cannot be said of Canfield that (*Roland,* 749 F.2d at 386):

> [A]lthough the ultimate relief that the plaintiff is seeking is equitable, implying that [it] has no adequate remedy at law, [it] can easily wait till the end of trial to get that relief.

That is generally not true in trademark cases, and it is especially true here (see Findings 28 and 29). As *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1158 (7th Cir.1984) put it (citations omitted, and quoting this Court's opinion in *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323, 333 (N.D.Ill.1981), *aff'd,* 694 F.2d 145 (7th Cir.1982) ):

> We note that it is the very nature of dilution to gnaw away insidiously at the value of a mark.... Such an injury would be remarkably difficult to convert into damages. "[T]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not [return] because of the existence of the infringer."

6. Balancing of harms involves the comparison of Canfield's irreparable harm from the wrongful denial of a preliminary injunction with "any irreparable harm that [Vess] might suffer from the injunction— harm that would not be either cured by [Vess's] ultimately prevailing in the trial on the merits or fully compensated by the injunction bond that Rule 65(c) of the Federal Rules of Civil Procedure requires the district court to make [Canfield] post" (*Roland,* 749 F.2d at 387). In this case Vess is free to market its product truthfully and accurately under the "chocolate" designation. If it were ultimately determined the injunction should not have issued (because the Chocolate Fudge mark was neither (a)

suggestive nor (b) "merely descriptive" with a secondary meaning attributable to Canfield), damages should be a reasonably adequate remedy for that harm. To the extent (if any) damages might not constitute an adequate remedy, that risk to Vess is substantially outweighed by the countervailing difficulties that Canfield would encounter in seeking to be made whole on the opposite assumption (denial of a preliminary injunction now, followed by Canfield's ultimate success on the merits) (see Findings 28 and 29 and Conclusions 4 and 5). Accordingly the balance of harms weighs substantially in Canfield's favor.

7. Though not strictly addressed to the balance of relative harms as defined in *Roland,* 749 F.2d at 387 and in Conclusion 6, a consideration of the parties' relative hardships (in terms of their respective stakes in the controversy) also bears examination (given the equitable nature of injunctive proceedings). Just such an examination has been undertaken by our Court of Appeals in the "relative harms" context of trademark disputes, in the cases cited later in this Conclusion 7. In that sense the balance of hardships weighs heavily in favor of granting interim relief to Canfield pending an adjudication on the merits:

> (a) Canfield has spent considerable time and money in its 13 years of promoting and selling its product under the Chocolate Fudge trademark. It has also spent substantial time and effort in promoting its product throughout the United States and in developing further distribution arrangements on a nation-wide scale since the Greene article appeared in January 1985. Canfield has a duty to protect its mark not only for itself but for the benefit of members of the public and its 12 licensees located throughout the United States.

> (b) Conversely Vess had minimal investment in the Chocolate Fudge designation when it was notified by Canfield (before Vess had commenced any sales) that Vess's use of Chocolate Fudge would constitute infringement of Canfield's trademark rights. All Vess's com-

mitments since that time (and they are insignificant in relation to Canfield's) have been undertaken with notice of Canfield's claim, at which point Vess may fairly be treated as having proceeded at its peril. Indeed, Vess has taken relatively little action to promote its product, for retailers have been communicating with Vess to request that the product be placed in their stores (ironically, the direct result of the demand created by and for *Canfield's* Chocolate Fudge). These factors entitle Vess to "little equitable consideration"—if indeed any. *Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333–34 (7th Cir.1977); *Wessley-Jessen*, 698 F.2d at 867; contrast *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir.1979).

 8. Canfield has established a substantial likelihood of success on the merits (far greater than the "better than negligible" standard stated in *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982) and cited with approval in *Roland*, 749 F.2d at 387):

(a) There is at least a reasonable basis for holding Chocolate Fudge is suggestive in association with a diet soft drink that contains no chocolate, sugar or other ingredients normally found in fudge and, at least equally important, wholly lacks the creamy, smooth, thick consistency that fudge itself has (and therefore

use of the word "fudge" connotes). Thus the term Chocolate Fudge is incongruous and "requires imagination, thought and perception to reach a conclusion as to the nature of [Canfield's] goods." *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 420 & n. 3 (S.D.N.Y.1980), *aff'd* 687 F.2d 563, 566–67 (2d Cir.1982). It is of course obvious that a word or phrase may be generic in one usage and may function as a trademark in another. 1 McCarthy, *Trademarks and Unfair Competition* § 11:22, at 498–99 (2d ed. 1984); *In re Seats, Inc.*, 757 F.2d 274, 275–77 (C.A.F. C.1985).

(b) There is an even greater basis for holding Canfield's Chocolate Fudge mark to be at least "merely descriptive." And were the mark determined to fit that characterization, the evidence already presented at the Hearing creates a substantial likelihood Canfield will be able to show Chocolate Fudge, as the result of 13 years of use and advertising and with the enormous springboard represented by the Greene article and the ensuing nationwide publicity and skyrocketing demand, has obtained the requisite secondary meaning to entitle Canfield to trademark protection. *Wesley-Jessen*, 698 F.2d at 865–66.[5] As to the special signif-

---

5. Vess's position on both Canfield's preliminary injunction motion and Vess's own summary judgment motion is in principal part syllogistic in nature:

 1. As a matter of law, no designation of a flavor can qualify for trademark protection.
 2. "Chocolate Fudge" is nothing more than a flavor designation for Canfield's goods.
 3. Chocolate Fudge therefore cannot be and is not a protectible Canfield trademark. Q.E.D.

In part that analysis is legally flawed for the reasons demonstrated by these Findings and Conclusions. But Vess's argument is also anachronistic and disingenuous in part. It invokes such authorities as *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 529, 44 S.Ct. 615, 617, 68 L.Ed. 1161 (1924) and *William Wrigley, Jr. & Co. v. Grove Co.*, 183 F. 99, 100–01 (2d

Cir.1910), each of which was issued at a time when the law simply would not allow trademark protection of a "merely descriptive" (let alone generic) name that had acquired secondary meaning. Those decisions were overtaken by passage of the Lanham Act, which specifically permits trademark protection for "merely descriptive" terms that have acquired secondary meaning. See Act § 2(f), 15 U.S.C. § 1052(f), with its deliberate omission of Act § 2(e)—the "merely descriptive" provision—from the list of marks that cannot be registered even though the registrant proves secondary meaning. For a discussion of the distinction made by the Act between (a) "common descriptive" (or generic) terms that, under the Act as at common law, cannot become valid trademarks and (b) "merely descriptive" terms, as to which the Act changed the common law where secondary meaning is present, see *Abercrombie & Fitch Co.*

icance of the vast amount of unsolicited media coverage that has ensued since publication of the Greene article (see Finding 10 and the exhibits there cited); *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir.1981) said in a related (though not identical) context:

> The fact that the enthusiasm and loyalty of Harlequin's readers have been the subject of extensive, unsolicited media coverage further supports the district court's finding of secondary meaning.

(c) Vess's survey "evidence" does not vitiate the force of Conclusions 8(a) and 8(b), for the survey wholly fails to comply with the well recognized standards established to assure the trustworthiness, accuracy and reliability of surveys, as rehearsed in *Borden, Inc. v. Kraft, Inc.*, 224 U.S.P.Q. 811, 820 (N.D.Ill.1984). Vess's survey lacks any evidentiary weight on the issue of secondary meaning. See the Appendix, the Palladino article cited and quoted in the Appendix and the cases cited by Palladino, particularly *Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.*, 533 F.Supp. 75, 79–80 (S.D.Fla.1981), *aff'd*, 716 F.2d 854, 860–61 (11th Cir.1983) and *Harlequin*, 503 F.Supp. 647, 650–51 (S.D.N.Y.1980), *aff'd*, 644 F.2d 946 (2d Cir.1981).

(d) Vess adopted and used "Chocolate Fudge" in association with its chocolate-flavored soft drink in an effort to capitalize on the sudden demand for Canfield's Chocolate Fudge. Vess uses the designation Chocolate Fudge as a trademark, and its use does not constitute a fair and good faith descriptive use (as illustrated by *M.B.H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50, 54–56 (7th Cir.1980)). Indeed Vess's "choice of the phrase ["Chocolate Fudge"] when other phrases [e.g., "chocolate" alone] were available could indicate an intent to trade on [Canfield's] good will and product identity," *Sierra On-Line, Inc. v. Phoenix Soft-*

*ware, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984), thus negating Vess's claim of non-trademark use. Accord, such cases as *Venetianaire Corp. v. A & P Import Co.*, 429 F.2d 1079, 1082 (2d Cir.1970). Vess's prominent use of Chocolate Fudge on its diet soft drink container is likely to cause confusion with Canfield's Chocolate Fudge trademark for identical goods.

(e) Vess's use of its own VESS housemark in conjunction with Chocolate Fudge is not a defense to Canfield's infringement claim, for the use of another's trademark constitutes infringement with or without the use of the infringer's housemark. *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir.1972) ("a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus 'an aggravation, and not a justification'"). Moreover, the VESS housemark may have little recognition outside the St. Louis area, and even in St. Louis members of the public might reasonably assume Vess had obtained a license to use the Chocolate Fudge trademark in association with its soft drink. *Id.; Trak, Inc. v. Benner Ski KG*, 475 F.Supp. 1076, 1082 (D.Mass.1979).

9. Service or disservice to the public interest is a relevant criterion in proceedings such as these if the "order granting or denying a preliminary injunction will have consequences beyond the immediate parties," *Roland*, 749 F.2d at 388. That standard is readily implicated in trademark proceedings, because the essence of the trademark concept is that the public has a stake in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality. Here the public interest would best be protected by the issuance of a preliminary injunction, particularly in light of the tremendous news coverage about Canfield's product throughout the

---

*v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir.1976), a decision followed by our own Court of Appeals in *Miller Brewing Co. v. G. Heileman*

*Brewing Co.*, 561 F.2d 75, 79–80 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978).

United States. Consequently members of the public would be benefited if any likelihood of confusion is avoided by preventing Vess from using Chocolate Fudge in association with its soft drink. *Hyatt*, 736 F.2d at 1159 says it simply:

The public has an interest in the protection of trademarks and trade names.

A fortiori the public interest will not be served by granting the injunction. *Wesley-Jessen*, 698 F.2d at 868.

■ 10. All the foregoing Conclusions demonstrate Canfield has met its burden as to all the prerequisites for preliminary injunctive relief. Accordingly Canfield is entitled to a preliminary injunction against Vess during the pendency of this action.

11. There is a genuine issue of material fact as to whether "Chocolate Fudge" has in fact obtained the requisite secondary meaning to entitle Canfield to trademark protection (Conclusion 8(b) deals only with the "substantial likelihood" on that score). This Court need not determine whether other genuine issues of material fact exist, for one such issue is enough to require denial of Vess's motion for summary judgment.

*Appendix*

At the Hearing Vess tendered a hastily-contrived survey to counter Canfield's trademark claim. During parts of the two days immediately preceding the Hearing, a market researcher (George Mantis, "Mantis") supervised a survey in which 191 passersby in several Chicago locations (quite close together) were shown Canfield's product and asked three questions (the second and third being asked if the first one drew a "yes" answer):

1. Have you purchased or consumed a soft drink within the past month?

2. What do the words "Chocolate Fudge" on this can indicate to you?

3. What does the word "Canfield's" on this can indicate to you?

As the questions indicate, the interviewer was instructed to hold up the Canfield's can to the interviewee at the time each of the second and third questions was asked.

Only three people mentioned "Canfield's" in response to question 2, while a great many gave what Vess's counsel calls "taste or flavor-type responses" or "product-type responses." Because of that, Vess Survey Mem. 3 says:

Based upon these results, Mr. Mantis testified that the survey demonstrates that the public does not perceive "Chocolate Fudge" on plaintiff's CANFIELD's as a brand name or symbol of origin. Rather, "Chocolate Fudge," like "orange," "cola," or "cherry cola," is an indication of flavor.

This Court need not decide whether, as Canfield Survey Mem. 4–5 urges, the "survey universe" chosen by Vess cannot fairly be projected to the relevant universe to support the conclusion sought to be drawn. Nor is it necessary to determine whether, as Canfield Survey Mem. 3 argues, Mantis' experience and background were insufficient to qualify him as an "expert" on surveys as to secondary meaning—though the obvious flaws in conceptualization of what he did really refute any weight his asserted expertise might carry in that respect anyway. Finally this opinion is not required to resolve the parties' dispute (contrast Canfield Survey Mem. 2, 3 with Vess Survey Mem. 5–6) whether the role of Vess's counsel in having designed the survey vitiates its probative force[1]—though once again the clear invalidity of the chosen methodology is especially troublesome, given the highly experienced counsel who framed the questions and assisted with the survey procedure itself.

■ Those questions need not be confronted because the survey so plainly carries its own death warrant as an indicium of trademark use or secondary meaning, or of the absence of either. It is really absurd to show someone a can with the word "Can-

---

1. See the discussion (and the cases cited) in the Palladino article quoted from later in the text,

73 Trade-Mark Rep. at 392 & nn. 8 and 9.

field's" (in large bold lettering) cheek-by-jowl with the words "Chocolate Fudge" (in prominent but slightly smaller type), ask the subject what the words "Chocolate Fudge" mean to him or her, and draw a negative inference when the answer does not come back "Canfield's." Surely the interviewee could rationally—indeed would most normally—respond in a manner that did not parrot what was so patent from the exhibited product itself: that the product was produced by (and therefore associated with) Canfield. At a minimum, no probative conclusion whatever can be drawn from the paucity of "Canfield's" answers to survey question 2.

All that is no more than sheer common sense, a quality singularly lacking in the proffered survey. It is worth quoting from the thoughtful discussion in Palladino, *Techniques for Ascertaining if There Is Secondary Meaning,* 73 Trade-Mark Rep. 391, 395, 396 (1983) (emphasis added):

A survey designed to test for secondary meaning should measure the level of association between a claimed trademark or trade dress and plaintiff's product. *This requires, first, a technique to isolate the mark or dress at issue* and, second, an appropriate question or series of questions.

\* \* \* \* \* \*

Creating a "prop" for a secondary meaning survey should not be confused with failing to replicate the market place in a likelihood of confusion survey. *Deleting plaintiff's name from a product or package is necessary in determining whether or not some other claimed indicia [sic] of origin possesses secondary meaning.* By contrast, masking defendant's name in a likelihood of confusion survey eliminates a cue as to the origin of a product which might reduce the level of confusion in an actual purchasing situation.

In addition to the vice already identified, Palladino suggests the questions drawn by Mantis and Vess's counsel are not properly calculated to determine the presence or absence of secondary meaning. All the Palla-

dino article's discussion of that topic bears reading, but again a brief quotation will suffice for current purposes (*id.* at 397):

In order to track the accepted definition of secondary meaning, including the anonymous source rule, a proper question should seek to determine whether or not a claimed trademark or trade dress is associated with plaintiff's product without asking respondents to give plaintiff's name.

Without necessarily endorsing any specific language, it is suggested that the question ought to be:

1. Do you associate [claimed trademark] with [product identification] of one, or more than one, company?

If a sufficient number of respondents answer "the [product identification] of one company," plaintiff prevails on the secondary meaning issue; the opposite outcome demonstrates a lack of distinctiveness.

That analysis is directly supported by the survey discussion in *Wessley-Jessen,* 698 F.2d at 866. This Court need not subscribe to a particular locution to decide (as it does) that the questions chosen by Vess and its counsel do not produce valid results.

Canfield Survey Mem. 7–8 (photocopies of which pages are attached) point up still another unsatisfactory aspect of the survey by a proper attack on Mantis' survey tabulation. Though this Court has not made its own retabulation to check Canfield's figures, it has reviewed all the individual responses. What does come through loud and clear is that a large number of responses—despite the unsatisfactory structure of the survey questions to derive conclusions about secondary meaning—support the notion "Chocolate Fudge" is "merely descriptive" or suggestive, *not* "common descriptive" or generic.

One final word is in order. For the same reasons and more, no inference of any kind may be drawn from the responses to question 3, posed to interviewees in the same manner as question 2. If anything that question, in the context it was posed, was

calculated to provide even less (if indeed any) information relevant to this Court's current inquiry.

In sum, Vess's survey does not deliver as advertised by Vess. It is non-probative as a means of negating either (1) the potential for trademark usage as such or (2) secondary meaning or (3) both.

Canfield Survey Memorandum

Finally, defendant's witness' tabulation of the survey was faulty and indicates a further misconception regarding proof of secondary meaning. Mr. Mantis testified that the survey reflected that only three out of 191 interviewees said CANFIELD'S, thus reflecting that there was little or no association with plaintiff. In fact, there are other responses in this poorly designed survey which indicate an association with a single source. Six interviewees responded with reference to Bob Greene, which plaintiff submits is an obvious indication that there is secondary meaning. (Nos. V000043; V0000187-191)

At best the survey is only useful to the plaintiff since it shows the suggestive nature of its mark and also that chocolate is the appropriate descriptive term for these types of soft dishes. Thirty-three of the interviewees responded that CHOCOLATE fudge means something other than a flavor but refers to a tangible product such as "candy," "ice cream," "chocolate fudge," "something to eat," "sweets," "a brownie," "hot fudge sundae," "fudge - like candy" and the like. (Nos. V000007; V000010; V000012; V000015; V000055; V000060; V000064; V000067; V000073-76; V000080; V000084; V000088; V000136-152; V000183.) Nine others merely answered "sweet" or "sounds sweet." (Nos. V000050-54; V000056-59.) Yet nine others responded with words such as "thick," "rich," "sticky" and "unusual". (Nos. V000116; V000153-156; V000180-182; V000186) Ten interviewees thought there might be chocolate or fudge in the can. (Nos. V000089-98.)

<u>Canfield Survey Memorandum</u>

Forty-one interviewees, representing the largest single group, responded that the words indicated "chocolate," "chocolatey" and the like, showing that they considered chocolate to be appropriate descriptive mark. (Nos. V000002-03; V000011; V000013; V000016-17; V000023; V000028; V000033; V000037-38; V000041-42; V000045-46; V000048; V000100; V000102-103; V000105-111; V000114-115; V000117-127; V000129.)

Finally, plaintiff submits that when asked "what does CHOCOLATE FUDGE on this can indicate to you?", many of the interviewees simply read back what is clearly printed on the can "CHOCOLATE FUDGE soda" or "CHOCOLATE FUDGE." These responses should not have been construed for anything, and clearly should not have been used to indicate that the interviewees consider the words only a flavor designation. (Nos. V000070-72; V000077-79; V000081-82; V000084; V000086; V000088-89; V000099; V000101; V000112-113; V000128.)

For the foregoing reasons, plaintiff submits that defendant's survey should be discounted.

Dated: June 12, 1985

Respectfully submitted,

Richard H. Compere
Pamela J. Johnson
Jeffery A. Handelman
WILLIAM BRINKS OLDS HOFER
 GILSON & LIONE LTD.
One IBM Plaza, Suite 4100
Chicago, Illinois 60611
(312) 822-9800
Attorneys for Plaintiff
A.J. Canfield Company