**WESLEY–JESSEN DIVISION OF SCHERING CORPORATION,**
**Plaintiff-Appellant,**

v.

**BAUSCH & LOMB INCORPORATED,**
**Defendant-Appellee.**

**No. 82–2237.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1982.

Decided Jan. 19, 1983.

---

Jeremiah D. McAuliffe, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., for plaintiff-appellant.

George B. Newitt, Allegretti, Newitt, Witcoff & McAndrews Ltd., Chicago, Ill., for defendant-appellee.

Before WOOD, ESCHBACH and POSNER, Circuit Judges.

ESCHBACH, Circuit Judge.

Wesley-Jessen Division of Schering Corporation ("Wesley-Jessen") appeals from the district court's granting of a preliminary injunction enjoining it from using designations that Bausch & Lomb, Inc. ("Bausch & Lomb") claims are its trademarks. For the reasons below, we affirm.

## I

Wesley-Jessen and Bausch & Lomb both manufacture soft contact lenses. In 1977, Bausch & Lomb introduced a spin cast, ultrathin soft contact lens with a diameter of 13.5 mm and a water content of approximately 38%. That lens was denominated U3, indicating its ultrathin thickness and its 13.5 mm diameter. In 1979, Bausch & Lomb introduced the U4, with a 14.5 mm diameter. These lenses proved very popular and were marketed with considerable success.

In 1980, Wesley-Jessen made its entry into the ultrathin market with its lathe cut "Gold Label" lens, which had a water content of approximately 30%. These lenses did not sell well. In August 1981, Wesley-Jessen introduced its Durasoft 2 line of ultrathin lenses with a water content approximating that of the Bausch & Lomb product. In its marketing efforts, Wesley-Jessen used the designations U3 and U4, it contends, to indicate thickness and diameter. Unlike the Gold Label lenses, these new lenses sold briskly.

On December 18, 1981, Wesley-Jessen filed a complaint seeking a declaratory judgment that its use of the designations U3 and U4 did not constitute trademark infringement or unfair competition. Bausch & Lomb counterclaimed, alleging, inter alia, that Wesley-Jessen's use of U3

and U4 is a false designation of origin or a false representation in violation of 15 U.S.C. § 1125(a). Bausch & Lomb moved for a preliminary injunction enjoining Wesley-Jessen from using U3 and U4 in conjunction with its lenses. In July 1982, after an evidentiary hearing, the district court enjoined Wesley-Jessen from using those designations or any confusingly similar designations in selling, distributing or promoting its contact lenses. The district court granted a limited stay to allow Wesley-Jessen to develop alternative sales and marketing techniques.

Wesley-Jessen appealed from the order granting a preliminary injunction. A panel of this court extended the stay through the first week in November when oral arguments were heard. The stay was then extended until the date of entry of this decision and order.

## II

Wesley-Jessen contends that the district court abused its discretion in granting a preliminary injunction. Wesley-Jessen argues that the court erred first, in relying on certain treatises not in evidence in evaluating the market surveys the parties offered; second, in determining that Bausch & Lomb would likely succeed in its case on the merits; and third, in determining that the equities of the situation weighed in favor of granting a preliminary injunction.

## III

■ Decisions to grant or deny preliminary injunctive relief are addressed to the sound discretion of the district court, and appellate review of such a decision is limited. *American Hospital Association v. Harris,* 625 F.2d 1328, 1330 (7th Cir.1980); *Ideal Industries v. Gardner Bender, Inc.,* 612 F.2d 1018, 1022 (7th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). The court's discretion is not unrestrained however; it must be guided by consideration of four factors:

(1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and,

(4) whether the granting of a preliminary injunction will disserve the public interest.

*O'Conner v. Board of Education,* 645 F.2d 578, 580 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). While the district court's judgment must be exercised within this framework, this court will not substitute its judgment for that of the district court unless we are convinced that the court abused its discretion. *See Helene Curtis Industries v. Church & Dwight Co.,* 560 F.2d 1325, 1330 (7th Cir. 1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). Moreover, if the district court decides that a preliminary injunction is appropriate, it has considerable discretion in fashioning suitable temporary relief. *Banks v. Trainor,* 525 F.2d 837, 841 (7th Cir.1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).

The only issue before us at this preliminary stage is whether the district court abused its discretion; we do not decide the ultimate merits of the case. *See Kolz v. Board of Education,* 576 F.2d 747, 748 (7th Cir.1978). We therefore consider Wesley-Jessen's objections to the district court's actions within the scope of the limited nature of our review.

### A

■ Wesley-Jessen contends that the district judge erred in relying on certain treatises provided by Bausch & Lomb in analyzing the market survey data submitted by both parties. Each party had conducted a survey and had presented a survey expert at the evidentiary hearing. The district judge asked both experts to recommend literature to assist her in evaluating the surveys. Bausch & Lomb's expert recom-

mended two books. Neither Wesley-Jessen's expert nor its counsel made any objection to this recommendation, and when given an opportunity, neither made any alternative recommendation. Bausch & Lomb arranged to have the books delivered to the judge and notified Wesley-Jessen of the delivery. Again no objection was made at the time of the delivery of the books. The judge used the books as background reference in analyzing the market surveys and ultimately concluded that Bausch & Lomb's survey was sound.

According to Wesley-Jessen, the district court's actions violated Rule 201 of the Federal Rules of Evidence, which allows a court to take judicial notice only of adjudicative facts that are generally known within the territorial jurisdiction of the court or that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Wesley-Jessen contends that the court, by relying on books not in evidence, in effect took judicial notice of the contents, which did not qualify for Rule 201 notice.

We do not regard the district judge's actions as taking judicial notice of the contents of the books. Judicial notice is based on the concept that there are certain facts or propositions which will be taken as true without requiring a party to prove them with evidence. *See* 9 Wigmore on Evidence § 2565 (Chadbourn rev. 1981). Judicial notice, in essence, is a substitute for evidence. The district judge did not use the books as a substitute for evidence, but rather as background information to help her interpret the evidence before her. This she did in an unbiased, open, and evenhanded manner. In open court, she solicited from both parties recommendations for reference materials. Wesley-Jessen knew precisely which reference works the judge would be considering and neither its expert nor its counsel made any objection until after the judge had made her decision. It is too late now for Wesley-Jessen to complain about the judge's use of the books.

## B

Wesley-Jessen next asserts that the district court erred in assessing Bausch & Lomb's likelihood of success on the merits. The district court concluded that Bausch & Lomb would likely establish that U3 and U4 are protectible trademarks because they had acquired secondary meaning. The court further preliminarily concluded that there is a likelihood of confusion between the parties' lenses with such designations and that Wesley-Jessen was infringing on Bausch & Lomb's trademark rights in using U3 and U4 as series designations.

■ It appears undisputed that U3 and U4 originated as merely descriptive terms and are protectible trademarks only if they have acquired secondary meaning denoting the source of the lenses. *See Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Terms that originally designated style, grade or size are treated as any other merely descriptive terms and such terms can acquire secondary meaning. *Ideal Industries v. Gardner Bender, Inc., supra,* 612 F.2d at 1022. A designation has acquired secondary meaning if the primary significance of the term in the minds of the consuming public is the producer rather than the product. *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *Walt-West Enterprises, Inc. v. Gannett Co.,* 695 F.2d 1050, 1056 (7th Cir. Dec. 21, 1982). Wesley-Jessen challenges the district court's finding that the designations U3 and U4 have acquired secondary meaning.

■ On the issue of secondary meaning, Wesley-Jessen first disputes the district court's interpretation of the market survey data submitted by both parties. Bausch & Lomb's market survey indicated that 96.7% of eye care professionals named Bausch & Lomb as the source of U3 and U4 lenses. Wesley-Jessen's market survey showed that only 7.7% said that U3 and U4 were brand names as opposed to sizes. Each party had its own survey expert to interpret the data and each party had an opportunity to recommend background reference materials to

the court. The court ultimately credited the Bausch & Lomb survey and rejected the Wesley-Jessen survey.

The district court's decision is soundly based. The key question in the Wesley-Jessen survey asks whether certain designations are brands or sizes. The answers are of little guidance, because even if those who responded thought of U3 and U4 as sizes as opposed to "brands," those designations could still have secondary meaning if they were also associated with a single source. Cf. Ideal Industries v. Gardner Bender, Inc., supra, 612 F.2d at 1022–24 (size designation associated with a single source). Since U3 and U4 are, after all, descriptive terms denoting size, it is not surprising that survey respondents said that U3 and U4 are sizes. The issue is not whether the survey respondents could arrive at the legal conclusion that U3 and U4 are "brands," but rather, whether they associated products marked with the U3 and U4 size designations with a single producer. It is this critical issue that the Bausch & Lomb survey addresses. Therefore, the district court's assessment of the survey evidence will not be disturbed.

Wesley-Jessen also challenges the district court's evaluation of other evidence on the issue of secondary meaning. It is undisputed that Bausch & Lomb was the first manufacturer to use U3 and U4 in connection with its lenses. Wesley-Jessen did not use U3 and U4 for its ultrathin Gold Label series, but instead used those designations only when it produced a product of approximately the same water content as the Bausch & Lomb lenses. Of approximately thirteen manufacturers of ultrathin soft lenses other than Bausch & Lomb, none save Wesley-Jessen uses U3 and U4 to designate size. One manufacturer, in fact, used U4 as a synonym for the Bausch & Lomb lens in an advertisement aimed at eye care professionals. That advertisement was captioned: "CSI vs U4 ... Syntex's new soft lens challenges B & L ...." While our chief focus is the attitude of purchasers toward the designations, id. at 1023, the view of this competitor in an advertisement aimed at the common pool of lens purchasers indirectly illustrates the at-

titude of these purchasers. To promote effective communication, an advertiser like Syntex tries, no doubt, to use terms in the same manner as its target market does. Thus Syntex's use of the term U4 reflects the market's understanding of the term. Additionally, Syntex's use of the term reinforces the term's unique association with Bausch & Lomb in the minds of the lens purchasers. The district court's preliminary finding of secondary meaning is amply supported by the evidence.

Wesley-Jessen disputes the district court's preliminary finding of likely confusion between the parties' products. Since the market for these lenses is composed of eye care professionals, and since a prescription for the Wesley-Jessen lens requires a piece of information (base curve) not required by a Bausch & Lomb prescription, Wesley-Jessen maintains that there is no danger of confusion.

"In determining whether likelihood of confusion exists, courts consider such factors as the type of trademark in issue, the similarity of design, similarity of products, identity of retail outlets and purchasers, identity of the advertising media utilized, [the alleged infringer's] intent, and actual confusion." Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 381–82 (7th Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). To the extent that this determination is not simply based on the similarity between the marks, likelihood of confusion is a question of fact subject to the clearly erroneous rule. Id. at 383.

As with other factual determinations, the district court was faced with conflicting evidence and had to decide which evidence to credit. The district court set out in its opinion the evidence on which it relied in concluding that there is a likelihood of confusion. Having reviewed and considered this evidence and the countervailing evidence advanced by Wesley-Jessen, we cannot say that the district court's finding of likelihood of confusion is clearly erroneous. The evidence shows identical designations used on nearly identical products sold to

identical markets through identical advertising media. Additionally, one affidavit, credited by the court, describes an incident of *actual* confusion: one customer mistakenly returned nineteen lenses in Wesley-Jessen vials labeled U3 and U4 to Bausch & Lomb.

Wesley-Jessen disputes the district court's preliminary finding of intent to trade on Bausch & Lomb's good will. Such intent is one factor to consider in assessing likelihood of confusion, but it is not a necessary factor. *See Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 613 (7th Cir. 1965). Even if the evidence had shown that Wesley-Jessen adopted the U3 and U4 designations in good faith and with no intent to deceive or confuse, there is ample evidence to support the district court's preliminary finding of likelihood of confusion.

Having concluded that Bausch & Lomb had established that it would likely prevail on the issues of secondary meaning and likelihood of confusion, the district court acted well within its discretion in finding that Bausch & Lomb was likely to succeed on the merits.

### C

Wesley-Jessen maintains that, even if Bausch & Lomb has established likely success on the merits, the other factors the court must consider in the context of interlocutory relief militate against granting a preliminary injunction.

Wesley-Jessen disputes the district court's finding of irreparable harm, stating that Bausch & Lomb has lost no sales or market share and that Bausch & Lomb's reputation is in no danger because Wesley-Jessen's lenses are of high quality. These arguments miss the mark. Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods, *Ideal Industries v. Gardner Bender, Inc., supra,* 612 F.2d at 1026, not because the infringer's goods are necessarily inferior. Even if the infringer's goods are of high quality, the victim has the right to insist that its reputation not be imperiled by another's actions. *Processed Plastics Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982); *see also* 4 R. Callman, Unfair Competition, Trademarks and Monopolies, § 88.3(b) at 205–06 (3rd ed. 1970). Bausch & Lomb's loss of control over its reputation justifies a finding of irreparable harm even if it could demonstrate no loss of sales or market share.

Wesley-Jessen contends that the balance of hardships between the parties militates against granting a preliminary injunction. Even where irreparable harm has been shown, the district court must consider the relative hardship to the parties in its decision to grant or deny preliminary relief. *Ideal Industries v. Gardner Bender, Inc., supra,* 612 F.2d at 1026. We first note that the district court was well aware of the hardship a preliminary injunction would cause Wesley-Jessen. The court in fact solicited a motion for a stay and then granted the stay to allow Wesley-Jessen time to develop an alternative to the U3 and U4 designations. We also observe that "[o]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." *Id.* Having failed in this duty, Wesley-Jessen "cannot now complain that having to mend its ways will be too expensive." *Processed Plastic Co. v. Warner Communications, Inc., supra,* 675 F.2d at 859. Balanced with the hardship Wesley-Jessen must endure is the irreparable harm Bausch & Lomb continues to suffer by having its reputation in the hands of another. In view of Wesley-Jessen's choice to run the risk of using the U3 and U4 designations, Bausch & Lomb's continuing harm, and the district court's efforts to minimize the harmful impact of a preliminary injunction, we conclude that the district court did not abuse its discretion in deciding that the balance of hardships favored the granting of this preliminary injunction.

Wesley-Jessen finally argues that the public interest is not served by the granting of the preliminary injunction be-

cause Wesley-Jessen's lenses pose no health hazard. Again, Wesley-Jessen's argument misses the mark. The question is not whether the public interest will be served, but whether the public interest will be *dis*served. *See O'Conner v. Board of Education, supra,* 645 F.2d at 580. Wesley-Jessen presents no argument that the public will in any way be harmed or disserved if this injunction becomes operative. The district court in fact concluded that the public would benefit if the existing likelihood of confusion were ended. The court did not abuse its discretion in concluding that consideration of the public interest favored the granting of a preliminary injunction.

### IV

The district court properly considered the four factors for preliminary injunctive relief and concluded that an injunction should issue. The district court did not abuse its discretion in so deciding. Therefore the stay granted by this court on November 4, 1982 is terminated and the order of the district court is affirmed.