**RUBBERMAID COMMERCIAL PRODUCTS, INC., Plaintiff,**

**v.**

**CONTICO INTERNATIONAL, INC., Defendant.**

Civ. A. No. 93–049–H.

United States District Court, W.D. Virginia, Harrisonburg Division.

Sept. 15, 1993.

 

Gregory Thomas St. Ours, Phillip C. Stone, Daniel Leroy Fitch, Wharton, Aldhizer & Weaver, Harrisonburg, VA, Edward G. Greive, Phillip L. Kenner, Douglas J. Hura, Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, OH, for plaintiff.

Douglas Tod Stark, Harrison, Thumma & Stark, P.C., Harrisonburg, VA, Brad Winters, Roman P. Wuller, Thompson & Mitchell, St. Louis, MO, for defendant and counter-claimant.

## OPINION

MICHAEL, District Judge.

Plaintiff Rubbermaid Commercial Products, Inc. ("Rubbermaid") is a Delaware corporation with its principal place of business in Winchester, Virginia. Defendant Contico International, Inc. ("Contico") is a Missouri corporation having its principal place of business in St. Louis, Missouri. Rubbermaid's complaint is for patent infringement, trade dress infringement and unfair competition in violation of § 43(a) of the Lanham Act, and common law trademark infringement. The dispute arises out of Contico's production, marketing, and sale of its "Huskee Squares" trash receptacle, which Rubbermaid alleges to be substantially similar to Rubbermaid's "Square Brute" receptacle. This court has jurisdiction of the subject matter of this action by virtue of 28 U.S.C. §§ 1332 and 1338, and venue is proper under 28 U.S.C. §§ 1391(c) and 1400(b).

The matter is now before the court on Rubbermaid's motion for a preliminary injunction that would enjoin Contico from mak-

ing, using, or soliciting for sale any products—particularly, the Huskee Squares line—that infringe the Square Brute patents, trademark, trade dress, or advertising. A hearing was held on the motion on July 7 and 8, 1993. Pursuant to Fed.R.Civ.P. 52, the court will now undertake to set forth its findings of fact and conclusions of law based on the evidence and argument adduced from the parties on Rubbermaid's motion.

## I. Findings of Fact

### A. Development and Marketing of the Square Brute

Rubbermaid employs 60 people in the new product development section of its refuse products division, which turns out roughly 12 new products per year. The company employs a four-phase development process, from initial market research to customer input and design, through preliminary engineering and, finally, to capital acquisition, manufacture, and marketing.

The market research phase typically takes from 6–10 months of the 2 years required on average to develop a new product fully. Beginning with Phase I in the mid-to-late 1980's, Rubbermaid identified a need among its customers for a square refuse container. The thought was that a square container would be more space-efficient than the round bins then available.

Rubbermaid set out to do more, however, than merely "square" its round container. For the new product to return Rubbermaid's investment adequately, it needed to be proprietary to Rubbermaid. The pre-manufacture development costs, based on hours devoted to the product over a 14–15 month period, exceeded $95,000. The tooling expense for the molds used to manufacture the new square bin were $1.1 million. The bin is manufactured in 28, 40, and 50 gallon sizes, and in a number of colors. These colors are more or less standard across the industry.

One means by which Rubbermaid sought to make the Square Brute proprietary was to incorporate in it a nesting feature in the side shoulder portion of the bin (on the two sides without handles), so that the handles of adjacent bins would fit inside a kind of pocket in the sides of the first bin. The aim was to allow the Square Brutes to line up more closely together, which was in keeping with the space-saving goals animating the Square Brute project.

The nesting feature became the subject of a utility patent secured by Rubbermaid on February 9, 1993, No. 5,184, 836. Square Brutes manufactured prior to that time, at least by the time Contico came out with the Huskee Square in 1991, bore a "patent pending" imprint regarding the nesting feature. At the preliminary injunction hearing, Contico conceded that its initial Huskee Squares model, manufactured until March, 1993, and sold as late as May or June, 1993, contained a nesting feature similar to the patented feature. Contico's most recent catalog contains pictures of the original Huskee Squares in connection with advertising for a cart to carry the Huskees; the catalog does not suggest that the old Huskee Squares are still available.

Rubbermaid did not warn Contico of the infringement until institution of this action in June, 1993, though Rubbermaid had been aware of the initial Contico Huskee Square since the Summer of 1991. Contico has voluntarily discontinued that product, and modified its current square container to delete the nesting feature.

Contico's discontinuation of its initial Huskee Square product, however, does not resolve this dispute. Indeed, Rubbermaid took a number of other steps to protect its new product from competition. These steps amounted to designing the Square Brute so as to give it an appearance unique enough to merit legal protection, either as trade dress or as a patented design.

The Square Brute design contains a number of elements serving ornamental as well as functional goals. The most general of these are the overall appearance, shape, and proportion of the product, which were intentional design features meant to distinguish the Rubbermaid square bin.

The overall appearance is achieved by combining a number of specific elements. There is a "shoulder," or protruding band, around the top of the bin which extends

around all four sides, except where interrupted by single "recesses," or indentations, which also appear on all four sides. These recesses are centrally located and extend the length of the bin's sides. As they extend downward from the lower edge of the shoulder, they expand in width from slightly wider than the width of the handles (which is the same as the width of the nesting pocket on the non-handle sides) to somewhat less than the full width of the bin at its base. The recesses diminish in depth as they go down toward the base. On all sides, the recesses also extend up from the bottom of the shoulder through the shoulder itself to the bin's rim, though along this portion of the sides, they are of uniform width and depth. The width at this portion of the recess on all sides is the same as the width of the handles, and the depth is that of the shoulder itself.

The Square Brute's handles are opposed, and run the length of the shoulder, measured top to bottom. The lid, which can be sold with the bin as a unit, is slightly crowned and features a raised square pedestal in the middle. The color of the lid, at least in the gray-colored Square Brute model in evidence, is somewhat darker than the bin itself. The handles on the lid and bin alike contain raised "piping," and the bracket holding the bin handle itself features a kind of hooked design which gives the lower portion of the bracket a barbed appearance. The rim of the bin is slightly thicker at the corners, and at the places corresponding to where the nesting pockets and handles are located on the sides of the bin.

All of these elements are depicted in the drawings of the Rubbermaid product that are the subject of a design patent secured by Rubbermaid on September 29, 1992, No. 329,930. The design patent does not state what the patent examiner took to be sufficiently novel about the design to merit patent protection. Rubbermaid produced drawings, however, of the prior art considered by the examiner. The drawings depict all of the key ornamental features incorporated in the Square Brute, but no one submission combines those elements in the manner of the Square Brute.

Contico placed in evidence a number of other renditions of prior art not before the examiner when Rubbermaid's design patent issued. In the main, these contain features the examiner already considered in the art that was before her, and are thus duplicative. At least two of Contico's examples of prior art, however, are noteworthy. They not only contain some of the Square Brute's design elements, but combine those elements in a way that appears at least superficially similar to the way those elements are combined to present the overall appearance of the Square Brute.

The first is the "Aladdinware" bin, designed in 1971 by the same individual who later designed the Contico Huskee Square. The Aladdinware product is a square bin with detachable lid, opposing handles, and—most importantly—flared recesses on each side. The recesses flare out in width as they approach the bottom, as do the Square Brute's, and, like the Square Brute, the Aladdinware product is designed such that the base of the bin is smaller than the top, giving it a slightly graduated appearance. On the other hand, the lid and handle are entirely different from those of the Square Brute, there is no shoulder around the top of the bin, the recesses terminate abruptly before they reach the bottom of the bin, and the recesses do not appear to diminish in depth along the length of the sides. In short, the Aladdinware piece incorporates a number of features that the examiner considered, but combines them in a way that only partially anticipates the Square Brute. Similar combinations of elements appear in the art considered by the patent examiner.

The same conclusion follows from an analysis of another of Contico's submissions, its own "Tuff Can" square container, which appears in a Contico catalog sometime prior to the development of the Square Brute. Like the Square Brute, this bin has a shoulder and centrally located side recesses that grow somewhat wider toward the bottom and diminish in depth until they actually reach the bottom. In addition, the handle sides bear an additional recess that—like the Square Brute—intersects and continues through the shoulder where the handle is located. That

recess appears to diminish in width through the handle portion of the shoulder recess as it goes up.

But the differences from the Square Brute are substantial. The Tuff Can hasn't the same graduated appearance as the Square Brute, it has *two* recesses on two of its sides, those recesses that appear on all the sides are narrower than the Square Brute's and do not intersect the bin's handles, and those recesses that appear only on the handle sides are not uniform in width through the shoulder. And again, similar combinations of elements appear in the art considered by the patent examiner, and did not derail Rubbermaid's application.

In short, Rubbermaid's product did mark a significant departure from the prior art, and relying on the perceived proprietary status of its new product, Rubbermaid spent more than $3 million to promote it. Rubbermaid advertised the Square Brute in catalogs, flyers, trade publications, and at various trade shows. The Square Brute appeared in catalogs targeting specific customer groups, namely, food service, industry, and sanitary maintenance.

The Square Brute is marketed almost exclusively through distributors, so Rubbermaid has taken various steps to introduce and promote the product through those distributors. In addition to its own flyers, Rubbermaid provided copies of line and photo art depicting the Square Brute to its distributors for incorporation in flyers circulated by the distributors themselves. In fact, Rubbermaid shares in the cost of its distributor advertising. Though the Rubbermaid logo is molded into the Square Brute and never leaves the product, Rubbermaid often allows "private labelling" by its distributors, whereby the name of the distributor is applied to the product, sometimes in a contrasting color. The Rubbermaid logo is featured prominently in all advertising and at trade shows.

Sales of the Square Brute have been brisk, nearly $7.5 million in the period from 1990–93. The vast majority of the sales have been to professional rather than consumer end-users. Internal audits revealed that Rubbermaid had achieved a sizeable market share with its new square bins, and had set a company record for first year sales. The pace of success slowed, however, in 1991, and Rubbermaid attributes the stall to the marketing of the initial Huskee Square product by Contico in June, 1991. Rubbermaid has produced no study isolating the introduction of its competitor's product as the causal variable in its sales decline, though it did discount the Square Brute in 1991 due to perceived competition from Contico. Contico established at the hearing that Rubbermaid also discounted its product somewhat when it initially launched it, and that Rubbermaid's powerful market position enabled it to boost sales of its product, at least initially, beyond the range to which sales declined after 1991. Contico's sales of its own Huskee Squares were, by its account, ordinary—36,000 units to some 500 customers—and could not have caused any real decline in Rubbermaid sales.

Nevertheless, Rubbermaid provided at least anecdotal evidence that the introduction of the Huskee Squares cut directly into its market for the Square Brute. After the introduction of the Huskee Squares line, BFI, a major sanitary maintenance end-user, approached Rubbermaid and threatened to abort its planned purchase of 2–6,000 Square Brute units in favor of purchasing a like number of Huskee Squares. BFI apparently regarded the Huskee Squares as essentially equivalent to the Square Brutes, and the Contico product was somewhat less expensive. Contico claims that one reason for BFI's change of heart is the Contico product's vertical stacking feature, a feature intentionally eliminated from the Square Brute. The court gives only limited credence to this claim, however, because BFI seems to have been willing enough to purchase from Rubbermaid once Rubbermaid lowered its price sufficiently to salvage the deal. In short, there is sufficient evidence on the record to conclude that Contico's Huskee Square product is at least one causal factor, albeit perhaps one of many, leading to the decline in Rubbermaid's return on its Square Brute product.

### B. *Development and Marketing of the Huskee Square*

Contico has a relatively small research and development group, and performed no mar-

ket study to determine the need for a square trash waste receptacle. For roughly twenty years, however, the company has marketed its products according to a "one-stop shop" concept, which owes its success to the customer's desire to meet the majority of his needs from one source. So when Rubbermaid came out with its square bin in 1990, Contico felt that it had to answer with a like product of its own, lest its "one-stop" customers turn away when they discovered that they could no longer make all their purchases from one source. Contico witnesses testified that Rubbermaid has taken similar competitive steps in reaction to new Contico products, for which Contico has not made a practice of seeking patents.[1]

Contico's design department, which employs four persons full-time and consultants as needed, was asked to "square" the round container it had marketed for a number of years. Sales in the Contico round had never been particularly brisk, but the product line was maintained to preserve Contico's one-stop shop concept. In "squaring the round," Contico stated that it began with the idea that its smallest square bin should have a height—lid and dolly included—lower than the 29 or 30 inch height of most tables in the restaurant industry. It should be noted, however, that Contico has not attended a restaurant trade show for two years.

The volume advertised on Contico bins is literal; that is, the advertised volume is the actual volume, whereas, according to Contico, Rubbermaid sometimes lists its bins as having less capacity than they actually do. Contico admits to having measured the small Rubbermaid Square Brute, which would have been the 28–gallon model, in developing its smallest square bin, which would initially have been marketed as a 28–gallon model as well. The company states, however, that the measurements were to verify capacity only. Contico now has replaced its 28–gallon bin with a 32–gallon version. Its larger sizes are sold in 48 and 55–gallon capacities, though

they first appeared in 40 and 50 gallon sizes. The actual capacities of the products, however, may not have changed.

The designer of the Huskee Square testified that the square shape and height restriction essentially dictated the proportions of the 28–gallon model, and that the same proportions were reproduced in the larger sizes to preserve a "family" appearance among the products. Contico denies copying the Square Brute. Whatever the case, it is clear that some reference was made to the Rubbermaid product during the development of the Huskee Square.

Against the advice of counsel, Contico incorporated a nesting feature in its original Huskee Squares product line. That feature was discontinued in March, 1993, before the institution of this action and without notice of infringement by Rubbermaid. The Contico square bin currently marketed is the same as the initial model, except that the top shoulder band is now continuous on the sides that once featured the nesting pocket.

In moving from a round to a square container, Contico preserved the "bullseye" lid design from the round container, though that design was reproduced in a square format. At least partially for reasons of structural integrity, Contico added recesses to the sides of its new bin, purportedly derived from flared recesses featured in the Aladdinware product designed in 1971 by the current designer of the Huskee Square.

The recess that Contico ultimately incorporated in its Huskee Square, however, is rather different from that found in the Aladdinware piece. The Huskee recesses are wider, and diminish in depth as they approach the bottom; that is not the case in the Aladdinware bin. The Aladdinware model did indeed feature recesses, but so did any number of other products considered by the patent examiner. In fact, but for the Huskee Square designer's personal connection to the Aladdinware features, there is no more of a

1. There has been a history of litigation between Rubbermaid and Contico over their competing products. There have been aspersions cast on both sides regarding the corporate personalities of both companies, with particular reference to alleged copying of each other's products. The

evidence, however, is not particularly reliable on this issue, and in any event is not helpful to the court's determination of what happened in this case in the development and marketing of the Huskee Square. For these reasons, it will not be considered at this time.

link between the Huskee Square and the Aladdinware piece than between the Huskee Square and any of these other products.

Nevertheless, Contico's position is that the design elements incorporated in the present version of its Huskee Square follow directly from a combination of the needs of its customers (i.e., the restaurant table height and the need for consistency in proportion throughout its Huskee Square product line), the design features required to convert a round unit to a square one without deviating from the general appearance of the round, and well-established design conventions (i.e., the flared recess).

Contico provided no estimate of the development costs of its Huskee Squares, but stated that the tooling cost for the molds used to manufacture the product cost approximately $1.2 million.

Contico first introduced its Huskee Square in mid–1991. Contico markets its square bins, like Rubbermaid, through distributors, but also directly to commercial end-users. Contico does not engage in a program of shared advertising with its distributors, but its recent catalog makes clear that, like Rubbermaid, it will "private label" for end-users.

### C. *Comparing the Huskee Square to the Square Brute*

There are a number of apparent differences between the Huskee Square and the Square Brute. The Rubbermaid lid is crowned (and therefore will not readily permit vertical stacking), with a raised center pedestal, while the Contico lid has a "bullseye" design—a raised rim, then a trough, then a raised center pedestal without crowning (a design that permits vertical stacking). The Rubbermaid lid handles feature raised piping, while the Contico lid handles are relatively smooth. The bin handles bear the same differences. The Rubbermaid bin handle has the barbed feature described earlier; the Contico model does not. The Rubbermaid side recesses taper in depth and width until the bottom of the bin; the Contico recess is similar, but terminates before the bottom of the bin. Finally, a top view of the Rubbermaid bin's rim shows a slight thickening around the corners and at the

places on the sides where either a handle or a recess appears. In comparison, the Contico rim is unbroken around its perimeter, and of uniform thickness throughout.

Nevertheless, there is an obvious overall similarity in the appearance of the products that cannot be gainsaid. Indeed, no two competitor pieces in all the art before the court—whatever the combination of similar design elements—are more similar in appearance. Part of the similarity comes from the proportions chosen for the products. Rubbermaid has placed in evidence a comparison of dimensions between its Square Brute and the original model of the Huskee Square, from which the new Huskee Square differs in only two ways according to the evidence before the court: 1) the bins are now sold in 32, 48, and 55–gallon sizes as opposed to the 28, 40, and 50–gallon versions; and 2) the side nesting feature has been eliminated. The dimensions are substantially similar, generally varying by no more than an inch, and often much less than that.

Contico explains the similarity in dimensions by stating that it began with a bin that could fit under a 29 or 30 inch restaurant table. It maintains that working backwards from that height in a square shape, preserving a certain "family" tie to the Contico round Huskee containers, and keeping a particular capacity in mind all but determined the proportions of the resulting receptacle— in the same way these constraints had determined proportions for Rubbermaid when it went from a round to a square receptacle. The problem with this response is that, with the possible exception of the desire to maintain a "family" appearance in the products, none of these design constraints required approximate matching of the Rubbermaid product's dimensions. Contico's "footprint," or base dimension, need not have been similar, and Contico need not have approximated Rubbermaid's shoulder and handle height, or the Rubbermaid product's graduated appearance. The extent to which these dimensional features could have derived merely from the demands of "squaring" a round Huskee is unclear from the record, but the court is troubled by how close the dimensions are.

Other aspects of the similarity in the products, while just as plain, are clearly not derived from merely "squaring the round." The recesses in particular represent a new choice for Contico—they are not present on the Contico round product and thus are not demanded by "family" ties to be present in the square. Though perhaps helpful for stability in a square container, there are other ways of strengthening a square bin sidewall, some even that would allow the side to remain free of recesses altogether and thus maintain a tighter connection to its Huskee "ancestors." And if recesses are chosen at all, they can be of nearly any shape or style and still serve the stability function adequately. To be sure, the Contico recess does terminate prior to the bottom of the container, and Rubbermaid's recess does not. But the termination is not readily perceived; unless one looks closely, the recess appears to travel the length of the bin, just as the Rubbermaid recess does.

The handle design, too, is a difference, though a relatively minor one. The piping on the Square Brute, and the barbed handle bracket, are trivial details separating what appear to be substantially similar products.

There is no dispute, finally, that the lids of the two products are obviously different. The question is whether the products in question as a whole are distinguished by their lids. The answer would appear to be "no." Not only do both companies sell lid and bin separately, but even if they were sold as a unit, the court believes that the Huskee Square might as readily be identified with the Square Brute as it would with the round Huskee from which Contico says it was derived. The contrary observations by Contico witnesses are difficult to credit on this point. The lid is indeed displayed prominently in Rubbermaid's design patent, but nothing in the prior art considered by the examiner indicates that the lid was a primary focus of the patent, that is, the novelty recognized in Rubbermaid's design.

## II. Conclusions of Law

### A. The Standard for Preliminary Relief

In the Fourth Circuit, district courts must consider, in "flexible interplay," four factors in determining whether to issue a preliminary injunction: 1) the likelihood of irreparable harm to the plaintiff without the injunction; 2) the likelihood of harm to the defendant with an injunction; 3) the plaintiff's likelihood of success on the merits; and 4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193–96 (4th Cir.1977). The Federal Circuit standard, which governs as to plaintiff's claim for patent infringement, differs only slightly in that it requires a "reasonable likelihood" of success on the merits. *See T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equip., Inc.*, 821 F.2d 646 (Fed.Cir.1987).

This court has understood the Fourth Circuit test in *Blackwelder* to suggest something of a sliding-scale relationship between the result of the balancing of harms between plaintiff and defendant—the most important inquiry—and the plaintiff's likelihood of success on the merits. *See Doe v. Shenandoah Co. School Bd.*, 737 F.Supp. 913 (W.D.Va.1990). That is, a strong showing of irreparable harm to the plaintiff may cause the court to place less emphasis on the merits in reaching its conclusion, though the plaintiff must even in that event mount a serious challenge against the defendant in order to prevail at this stage. *See Id.* Unlike the Fourth Circuit, the Federal Circuit has not suggested to the district courts any particular emphasis in application of the test, though the inquiry is a flexible one there as well, with no single factor given dispositive weight. *See Hybritech, Inc. v. Abbott Laboratories, Inc.*, 849 F.2d 1446 (Fed.Cir.1988). Accordingly, this court will begin with an analysis of the harms faced by each party, then move to a discussion of the merits and, finally, assess the public interest as it bears on this motion.

### B. Discussion

#### 1. Risk of Irreparable Harm to Rubbermaid

Rubbermaid states that standing alone a showing of substantial likelihood of confusion between the products or, as to its patent claims, a clear showing of patent validity and infringement, presumptively supports a find-

ing of irreparable harm. *See, e.g., Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir.1983) (federal unfair competition claims); *Smith Intern., Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983) (patent claims). For the moment, however, the court will examine the risk of harm to Rubbermaid in isolation, pending the final weighing of the *Blackwelder* factors.

■ The harm flowing to Rubbermaid should this court decline to grant the injunction could well be substantial. This court has found that the introduction for sale of the Huskee Square has diminished sales of the Square Brute, though the degree to which it has done so is not well demonstrated in the record. Were lost sales alone the concern, this court would incline against finding *irreparable* harm. The irreparable harm for the purposes of this analysis is that which would be done to Rubbermaid's standing in the market were Contico allowed to continue selling its product, which, even assuming it is not impermissibly similar to the Square Brute, is still similar enough to damage Rubbermaid significantly.

Absent a preliminary injunction, Contico would continue to seek a toe-hold with distributors and end-users who would see no need to carry or use both products and who, even if they chose Rubbermaid, would make Rubbermaid pay for the choice. The incident with BFI, in which the major end-user indicated that it would select Rubbermaid over Contico only if Rubbermaid lowered its price, amply demonstrates this point. The contacts Contico could build in the market pending the outcome of this case would likely endure even if this court ultimately decided permanently to enjoin Contico from producing or selling the Huskee Square. That is a harm this court would be without power to repair.

■ Contico argues that Rubbermaid's delay in bringing this action militates against a finding of irreparable harm. It is true that Rubbermaid learned of the Huskee Square in the summer of 1991, after it began marketing the Square Brute, and did not sue Contico until early June, 1993. Rubbermaid did not

secure its design patent, however, until late September, 1992 and did not have its utility patent until February, 1993. Though Rubbermaid might have sued on its trade dress claims before these patents issued, there is no doubt that the existence of the patents would tend to strengthen the case against Contico. Rubbermaid cannot be faulted for wishing to bring all of its claims in one action.

The real delay, then, is between the time of patent issuance and the filing of the complaint in this case. That delay, at most, is approximately eight months. The record indicates that Rubbermaid did not approach Contico in that interval regarding its alleged infringement. Nevertheless, the actual delay in this case is not a substantial one, and in the absence of prejudice to Contico occasioned by the delay, it is insufficient in itself to defeat a finding of irreparable harm in plaintiff's favor.

### 2. *The Risk of Harm to Contico*

■ Contico's investment in its Huskee Squares line is by no means as substantial as Rubbermaid's in its Square Brute line, nor does it stand to lose as much as Rubbermaid in sales. Even were this not the case, much of the harm to Contico from an injunction could be addressed by the security required by Fed.R.Civ.P. 65(c), should Contico ultimately prevail on the merits. The more salient harm from an injunction would be similar to that posed to Rubbermaid from no injunction, that is, a loss of standing in the market. Contico is particularly concerned by Rubbermaid's delay in bringing suit, and has suggested that Rubbermaid strategically waited for Contico to enter contracts to supply Huskee Squares before acting, hoping to step in and fill them once Contico is enjoined.

The court takes the risk of harm to Contico very seriously, but the balancing of harms must take into fuller account the nature of competition between these companies. Contico itself pointed out that it and Rubbermaid typically know quite well what one another is doing. That being the case, the evidence unsurprisingly suggests that Contico knew about Rubbermaid's practice of making its products proprietary, knew from frequent lit-

igation that it guarded those products jealously and, most importantly, knew it had developed a square bin and was attempting to secure at least a utility patent on it.

When Contico decided to "square its round," it did so in reaction to the Rubbermaid bin, and with the aim of competing directly with it. And while the permissibility of the similarity between its product and Rubbermaid's has yet to be determined, it is quite clear that Contico could have chosen design features that would distinguish its product and avoid controversy—while still preserving ties to its round Huskee products. Contico chose not to do so, and the harm it might suffer from an injunction must be evaluated with this in mind.

Contico claims, however, that should it be enjoined from selling the Huskee Square, it would lose market share to Rubbermaid on not only that product, but a host of other products as well. This is due to the "one-stop shop" concept it has employed for over twenty years, by which Contico products in some sense sink or swim together. It is difficult to believe that the "one-stop-shop" concept makes Contico as vulnerable to competition as it claims. Indeed, Contico manages to sustain itself in the face of competition from all sides on the other members of its family of products, that is, other than its square bins. If its inability to sell one item so doomed the company, it would have done away with the one-stop concept years ago. The court therefore cannot find that the deletion of one particular product poses a harm of the magnitude Contico suggests.

### 3. Balancing the Harm

For the reasons set forth above, the balance of harms tips in favor of Rubbermaid. While the irreparable harm it fears is neither different in kind from or more creditable than the harm Contico fears, Contico's knowing entrance into a risky venture lays much of the harm at its own doorstep. Rubbermaid's delay in bringing suit is not egregious on its face, and cannot be said on this record to have prejudiced Contico, again due to the manifestly risky nature of Contico's production and sale of a square bin strikingly similar to Rubbermaid's product.

It must be noted, however, that whatever action the court takes will significantly and detrimentally affect one of the parties in favor of the other. The balance, therefore, is not overwhelmingly tipped in Rubbermaid's favor as to this factor, at least not so much that this court feels that it may deemphasize an analysis of the merits of the case.

### 4. Likelihood of Success on the Merits

#### a. Infringement of the Design Patent

■ In patent cases, the movant for preliminary relief must make a "clear showing" of a "reasonable" likelihood of success on the merits, both as to the validity of the patent, and its infringement by the defendant. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir.1985). Ultimately, there is infringement only when the ordinary observer would purchase one product taking it to be another. *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 819 (Fed.Cir.1992) (quoting *Gorham Co. v. White*, 81 U.S. (14 Wall) 511, 528, 20 L.Ed. 731 (1871)).

■ The validity of the patent is presumed, *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985), but that presumption may be rebutted if the defendant shows that the patented design is either obvious in light of prior art, or primarily functional rather than ornamental. *Avia Group Intern., Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1563 (Fed.Cir.1988). It has been Contico's position that the majority of the features of the Square Brute, alone and in combination, are obvious in light of prior art. Contico does not contend that the patent is invalidated by this, but only that it must be narrowly construed to protect only a few truly novel features. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 n. 6 (Fed.Cir.1990) (stating that, if possible, patent should be construed so as to support its validity). Contico includes among those novel features only the Square Brute's crowned lid, a recess continuing through the shoulder to the top of the bin on the non-handle sides, and decorative piping on the lid and bin handles. These are features the Huskee Square does not currently contain.

At issue is the "point of novelty" protected by the design patent, that part of the design sufficiently distinct from the prior art to support patent protection. Contico has thus evaded a frontal attack on the issue of validity, but raises validity issues indirectly to narrow the scope of the patent such that Contico cannot be said to infringe it. *See Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed.Cir.1984) ("point of novelty" approach applies only to infringement, not to issues of patent validity). According to Contico, Rubbermaid is improperly contending that the patent covers the overall appearance of the bin as its point of novelty, when according to Contico it can only cover the individual or combined elements not present in the prior art. In support of its position, Contico cites *Winner Intern. Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376 (Fed.Cir.1990):

> To consider the overall appearance of a design without regard to prior art would eviscerate the purpose of the 'point of novelty' approach, which is to focus on those aspects of a design which render the design different from prior art designs. (citations omitted).

There is nothing, however, in the *Winner* holding that suggests that the overall appearance of the design must be disregarded. Indeed, the "ordinary observer" test would preclude such a rule. While the point of novelty approach does command an inquiry into specific elements in the prior art as an initial matter, it does not preclude an analysis of how those elements are combined and integrated into an overall design, and of whether that design has been anticipated. Individual design elements, alone or in combination, may well appear again and again in the prior art, but so long as their ultimate integration into the overall design is novel, the patent is valid as to that combination of design elements.

The *Winner* court's holding thus must be understood only as a caution against uncritical global assessments of a given design. To be sure, the analysis of individual elements disciplines the inquiry into novelty, but it cannot exhaust it. The *Braun* case, 975 F.2d at 820 & n. 7 (citations omitted), indicates as much when it makes clear that the "point of novelty" test is a supplemental one, and that

> In evaluating a claim of design patent infringement, a trier of fact must consider the ornamental aspects of the design as a whole and not merely isolated portions of the patented design.

The scope of Rubbermaid's patent therefore is rather broader than Contico suggests. This is supported by the fact that even the points of novelty Contico offers, under the terms of its own test of validity, either were not considered or likely would have been considered obvious. There was no prior art before the examiner depicting handles or crowned lids in isolation. This suggests that those features were deemed minor in the overall scheme of the design at issue. It is clear, moreover, that the prior art is replete with recesses. If the integration of Rubbermaid's recess design—the recess tapering in depth and width—into the overall design is obvious, it is hard to see why extending the recess through a top shoulder band is not just as obvious. Yet Contico distinguishes this feature as a point of novelty and, conveniently, one that it no longer appropriates.

Ultimately, then, the inquiry must shift to whether Contico appropriated what may fairly be said to be the point of novelty of the Square Brute—not the individual minor elements Contico identifies, but that combination of elements that contributes to a distinctive overall appearance. This combination of elements is precisely what Contico incorporated in its Huskee Square, and the product as a result is similar enough to the Square Brute to fool the ordinary observer.

Specifically, Contico virtually matched the proportions of Rubbermaid's container, to an extent not mandated by the need to preserve a "family" appearance between its square and round containers.[2] The single recesses on the sides of the present Huskee Square version are centrally located, taper in depth

---

2. Moreover, the Square Brute patent cut off Contico's ability to preserve any "family" appear-

ance if that meant infringing the patent.

and width, and continue through the shoulder on the handle sides—all just the same as the Square Brute. The elimination of the nesting recess on the non-handle sides does not materially detract from the overall similarity of the two pieces. It is true that the recesses on the Contico model can be said to terminate before the bottom of the bin, unlike Rubbermaid's recesses, but that termination is not readily apparent to the ordinary observer, and represents only the most superficial departure from the Rubbermaid design.

In short, there is ample support in fact and law for Rubbermaid's claim of design patent infringement. It has met its burden of showing a reasonable likelihood of success on the merits as to this claim.

### b. *Infringement of the Trade Dress*

■■■■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the "use in commerce" of any "false designation of origin" which is likely to cause confusion as to the origin of the product which bears that false designation. The Act seeks an appropriate balance between protecting consumers from confusion and enhancing the competition that comes from fair imitation of products. The ultimate test is whether the public is likely to be deceived by the similarity of the "marks" of origin displayed in the product, such that there is a likelihood of confusion as to the source of the product. *See Frances Denney, Inc. v. New Process Co.,* 670 F.Supp. 661 (W.D.Va.1985), *affirmed,* 228 U.S.P.Q. 360, 1986 WL 83756 (4th Cir.1986).

■■■ Section 43(a) has been interpreted to allow the first manufacturer of a product an unregistered trademark in the "trade dress" of its product. *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 448 (4th Cir.1986). "Trade dress" refers to the total image of a product and may include such features as size, shape, color, texture, and graphics. *Stormy Clime, Ltd. v. Progroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987). Over the years, courts have accorded trade dress essentially the same protection as registered marks. *Two Peso, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615 (1992) (Stevens, J. concurring). This is because a product's design can serve to distinguish it from other products in much the same way a trademark can. *Wallace Intern. Silversmiths, Inc. v. Godinger Silver Art Co.,* 916 F.2d 76, 78–79 (2d Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). As to this claim of trade dress infringement, the law of the Fourth Circuit is controlling. *Oakley, Inc. v. Intern. Tropic–Cal, Inc.,* 923 F.2d 167, 169 (Fed.Cir. 1991).

■■■■ To be eligible for protection under the Lanham Act, trade dress must be non-functional. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 863, 102 S.Ct. 2182, 2193, 72 L.Ed.2d 606 (1982). A design is only functional if it is one of a limited number of efficient design options open to competitors. *Sicilia di R. Biebow & Co. v. Cox,* 732 F.2d 417, 429 (5th Cir.1984). In this case, the only functional design parameters relevant to this definition would be the square shape of the bin, the need for some form of structural enhancement for the sidewalls, perhaps the height of the bin, and more or less customary color schemes in the industry. None of these parameters dictates the particular proportions and recess design featured in the Square Brute, which in large part comprise its trade dress. The Square Brute's trade dress is therefore nonfunctional.

■■■■ Protection is also contingent on the trade dress having either inherent distinctiveness or an acquired distinctiveness called "secondary meaning." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757. The plaintiff need only show secondary meaning if its trade dress is not inherently distinctive. *Id.* Like trademarks, trade dress is classified according to the framework set out in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976): it may be either 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; or 5) fanciful. *Id.* Only the latter three categories denote inherent distinctiveness, and the line between "suggestive" and "descriptive," that is, between protection and non-protection, is difficult to draw. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757; *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1528 (4th Cir.1984). Nevertheless, a design

is only "suggestive" if it communicates to the consumer, by inference, a particular characteristic of the product, such as its origin. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757; *Pizzeria Uno,* 747 F.2d at 1528. It is "descriptive," and not entitled to trade dress protection, if it merely communicates the qualities of the product without implying anything further about it. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757; *Pizzeria Uno,* 747 F.2d at 1528.

■ In the context of this case, it is apparent that while Rubbermaid's design is novel enough to merit a design patent, it is not itself suggestive of Rubbermaid as its source, nor of anything other than that the product is a square refuse bin with handles and a lid. From what the court perceives of the prior art, the Square Brute is not so similar to prior Rubbermaid designs that its configuration of design elements would lead to the conclusion that it is a Rubbermaid product. While it is true that the Square Brute literally bears Rubbermaid's imprimatur in the form of an embossed logo, that logo is not so apparent nor so integrated with the overall trade dress of the Square Brute as to "suggest" anything to the consumer. Because Rubbermaid's trade dress is merely descriptive, it is not inherently distinctive.

■ The next question is whether the Square Brute has *acquired* distinctiveness, or "secondary meaning" by its exposure to consumers. Courts traditionally have approached this question by analyzing, among other indicia, advertising expenditures, the length and exclusivity of the design's use, and sales success. *See Pizzeria Uno,* 747 F.2d at 1528 n. 3. Secondary meaning can exist if the public links the product to a single source, even if that source is anonymous. *Sunbeam Corp. v. Equity Industries Corp.,* 635 F.Supp. 625, 629 (E.D.Va.1986), *affirmed,* 811 F.2d 1505 (4th Cir.1987) (citation omitted).

■ Rubbermaid established quite clearly that it spent over $3 million advertising and marketing its product, and that the market penetration achieved by the Square Brute exceeded expectations. The Square Brute looks different from its competitor products, save Contico's, and the Huskee Square did not come on the market until some 15 months after the Square Brute did. That means that the Square Brute design stood more or less without imitation for 15 months. The sales success during that period is also clearly shown. In short, there is sufficient evidence here to find secondary meaning in the Square Brute.

■ This is so even absent the presumption in favor of secondary meaning where there is intentional copying. *Kramer,* 783 F.2d at 450. The inference of intentional copying by Contico is strong here, however, and were the court to apply the presumption it would find it unrebutted by any evidence that the Square Brute had not in fact acquired secondary meaning. At the very least, the fact that Contico appropriated the key features of Rubbermaid's trade dress indicates that Contico felt there was consumer recognition of the Square Brute on which Contico could trade.

■ A similar presumption from intentional copying operates in the Fourth Circuit in favor of a likelihood of confusion, the final stage of the federal unfair competition analysis. *Osem Food Industries, Ltd. v. Sherwood Foods, Inc.,* 917 F.2d 161, 165 (4th Cir.1990). As with its analysis of secondary meaning, however, the court will weigh the evidence of a likelihood of confusion independently, in part to determine whether the presumption was rebutted, and in part to determine whether the court would reach the same conclusion without making a specific finding of intentional copying.

In *Pizzeria Uno,* 747 F.2d at 1527, the Fourth Circuit enumerated a series of factors, none of them dispositive, to be used in assessing the likelihood of confusion. The first of these, the strength of the plaintiff's "mark," weighs only somewhat in plaintiff's favor. Within the realm of refuse receptacles, the Square Brute does stand out, but not radically so. Its novelty stems from its unique combination of traditional design elements, not from any conspicuously unusual shape or style. The second factor, however, the similarity of the products, is entirely in Rubbermaid's favor. A casual appraiser of

the products side-by-side would conclude that they were nearly identical; a consumer who had seen both products but who had only one before him would likely confuse the products even on closer inspection.[3] The goods themselves are, of course, virtually identical in function, a third factor in the *Pizzeria Uno* analysis. The court's review of the advertising and marketing efforts for both products also reveals a substantial similarity, which also weighs in the assessment of confusion. If there is a difference, it is only that Rubbermaid advertises and markets more extensively than does Contico, though to the same general category of distributors and end-users.

One factor in the analysis gives the court some pause, however, and that is the incidence of actual confusion as it bears on the question of likely confusion. Contico has suggested that the BFI incident indicates that Rubbermaid's customers are in fact not confused by the similarity in the two products; for example, BFI was able to distinguish the two products and their manufacturers well enough to play one company against the other. From this, Contico concludes that the commercial end-users that both companies service are sophisticated enough not to be fooled by so-called "knock-off" products. The claim is that these consumers attend the trade shows and peruse the advertising literature—both of which feature company names prominently—and as a result know Contico from Rubbermaid.

It is not clear, however, that a smaller-scale end-user, and in particular one who was not in the business of waste disposal as BFI is, would be so canny or discriminating. While very few of either company's customers for these bins are casual consumers, there is surely a wide range of sophistication

among them. Not all end-users attend trade shows or peruse advertising; in fact, many might look no further than a bin's appearance (and price), purchasing on the basis of a general familiarity with an appearance they first noted in the Square Brute. If this were not the case, it is difficult to see why Contico would have designed its product to look so much like the Square Brute.[4]

Ultimately, the court must conclude that, wholly apart from any presumption, there is a likelihood of confusion between the two products sufficient to sustain Rubbermaid's showing of likely success on the merits of its trade dress claim. Were this court to apply the *Osem* presumption, it would find it unrebutted.

■■■ The same conclusion must follow with regard to Rubbermaid's claim under Virginia law for unfair competition based on Contico's appropriation of its trade dress. State regulation of copying of non-functional features is not preempted by federal law. *Sunbeam,* 635 F.Supp. at 637–38 (citations omitted). And with the exception of the *Osem* presumption, the requirements for success on the merits of this claim are substantially similar to those for the federal Lanham Act claim. *See Rosso & Mastracco v. Giant Food Shopping Center,* 200 Va. 159, 104 S.E.2d 776 (1958).[5] Therefore, having demonstrated a likelihood of success on the merits of its Lanham Act claim, Rubbermaid will be deemed to have made a similarly sufficient demonstration on its common-law claim.

### 5. *The Public Interest*

In assessing the public interest, the court must account for a number of concerns not readily quantifiable. On the one hand, the public surely has an interest in protecting

---

3. This is so even though the Square Brute bears the Rubbermaid logo and is sold in different capacities than the Huskee Square. An observer of the Huskee Square is not likely to infer that it is not a Rubbermaid product from the *absence* of a logo. Nor is he likely to infer a source other than Rubbermaid simply by noting the different capacities.

4. The court in *Pizzeria Uno,* 747 F.2d at 1535, identified the defendant's intent as a factor in its analysis, and one that can be critical in some

cases. It should be noted, however, that in alluding to Contico's intent, the court is not importing the *Osem* presumption into its analysis.

5. Though much of the Virginia law of unfair competition involves trade *names,* the same jurisprudence addresses the physical attributes of goods, which constitute the trade dress. *See* Trademarks, Trade Names, and Unfair Competition, Michie's Jur. of Va. and W.Va., § 4, p. 503 (1985).

innovation, and this concern is amply expressed in our laws against patent infringement and unfair competition. Here, the ability of Contico to match Rubbermaid's product, without incurring nearly the costs that Rubbermaid spent in research and development, is troubling.

On the other hand, the court is mindful that these companies are intense competitors, and that an injunction here might well chill the willingness of the next company that wishes to respond aggressively to a competitor's new product. Absent the chilling effect of an injunction such as is requested here, that company might be willing to tread up to—but not over—the boundaries delineated by our laws. That concern is unavailing, however, where, as here, a new product does not preclude further innovation. Contico could easily have answered with a square container of unique design, and need not have matched Rubbermaid's product so closely in order to compete with it.

The public interest thus weighs in Rubbermaid's favor. And because the product at issue is, after all, one waste receptacle among many and not a wonder drug in short supply, the public will not be harmed significantly by its removal from the market.

### C. Conclusion

The court concludes that because the balance or harms and the public interest weigh in Rubbermaid's favor, and because Rubbermaid has demonstrated a sufficient likelihood of success on the merits of all its claims, an appropriate preliminary injunction should issue against Contico. This conclusion makes it unnecessary for the court to consider the applicability and effect of any presumption of irreparable harm from a showing of likely success on the merits. *See Wesley–Jessen,* 698 F.2d at 867; *Hughes Tool Co.,* 718 F.2d at 1581.

### III. Scope of the Preliminary Injunction

In general terms, Contico must be preliminarily enjoined from making, using, advertising, marketing, or selling any products that infringe either United States Letters Patent No. 5,184,836 or United States

Design Patent No. Des. 329, 930. Contico must also be preliminarily enjoined from making, using, advertising, marketing, or selling any products that infringe the trade dress of the Rubbermaid Square Brute product line by tending to cause confusion as to the origin of the product.

The court will now turn to the specific items that will be subject to the injunction. Contico has represented that it no longer makes or sells the original version of its Huskee Square, which contained the nesting recess covered by Rubbermaid's utility patent. Nevertheless, the court feels it appropriate preliminarily to enjoin Contico from making, using, marketing, advertising, or selling this original version pending the outcome of this litigation. Contico may not fill any existing orders for this receptacle, nor may it solicit any new orders. Having discontinued this version in March, 1993, Contico has now had ample time to clear its inventory of the bins, and should have solicited no new orders for them.

As to the current version of the Huskee Square, the version without the nesting recess, Contico shall be enjoined from making, using, advertising, marketing or selling any of these Huskee Square products pending the outcome of this action. Contico may fill any orders for the Huskee Square placed with it prior to June 8, 1993, the filing date of Rubbermaid's motion for a preliminary injunction, but no others. These orders must have been final before June 8, 1993; ongoing negotiations at whatever stage as of June 8, 1993 are not to be considered as having resulted in a final order for the receptacles.

There was no argument by Rubbermaid at the hearing regarding infringement of its advertising itself, though the complaint does allege such infringement. Consequently, no advertising other than that which features products which are enjoined herein is itself enjoined.

An appropriate Order shall this day issue.

### ORDER

On June 8, 1993, plaintiff moved for a preliminary injunction in the above-styled case. A hearing was held on the motion on

**1264**

July 7 and 8, 1993. For the reasons stated in the accompanying Opinion, it is this day

ADJUDGED AND ORDERED

that:

1) The plaintiff's Motion for Preliminary Injunction, filed June 8, 1993, shall be, and it hereby is, granted.

2) Pending the outcome of this litigation, the defendant shall be enjoined as follows, and as set forth more fully in the accompanying Opinion:

a) The defendant shall not make, use, advertise, market or sell any products that infringe either United States Letters Patent No. 5,184,836 or United States Design Patent No. Des. 329, 930.

b) The defendant shall not make, use, advertise, market or sell any products that infringe the trade dress of the Rubbermaid Square Brute product line by tending to cause confusion as to the origin of the product.

c) The defendant shall not make, use, advertise, market or sell either the original version of its Huskee Squares product or the version of the Huskee Squares product currently marketed.

d) The defendant shall fill no orders for the purchase of the original version of its Huskee Squares product.

e) The defendant shall fill no orders for the purchase of the current version of its Huskee Squares product not finalized prior to June 8, 1993.

3) Pursuant to Fed.R.Civ.P. 65(c), the preliminary injunction will become effective only upon the posting of appropriate security in the amount of $25,000 with the Clerk of the Court.

The Clerk of the Court is hereby directed to send a certified copy of this Order and the accompanying Opinion to all counsel of record.